# United States District Court
# Eastern District of New York

11-CV-06270
(Vitaliano, D.J.)

TYRONE JOHNSON,

*Petitioner,*

against

Superintendent Philip D. Heath,

*Respondent.*

## AFFIDAVIT AND MEMORANDUM OF LAW IN OPPOSITION TO PETITION FOR A WRIT OF HABEAS CORPUS

RICHARD A. BROWN
District Attorney
Queens County
*Attorney for Respondent*
125-01 Queens Boulevard
Kew Gardens, New York 11415
(718) 286-5862

JOHN M. CASTELLANO
JOHNNETTE TRAILL
  Assistant District Attorneys
    *Of Counsel*

MAY 30, 2012

# **TABLE OF CONTENTS**

Page No.

AFFIDAVIT IN OPPOSITION TO PETITION FOR A
WRIT OF *HABEAS CORPUS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL AND LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . 3

The Motion to Vacate Judgment . . . . . . . . . . . . . . . . . . . . . . 11
Petitioner's Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . 19
The Coram Nobis Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
The Current Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

MEMORANDUM OF LAW IN OPPOSITION TO PETITION
FOR A WRIT OF HABEAS CORPUS . . . . . . . . . . . . . . . . . . . . . . 26

POINT ONE

_____THE STATE COURT'S REJECTION OF
PETITIONER'S CLAIMS THAT HE WAS
DENIED THE RIGHT TO BE PRESENT AND
RIGHT TO COUNSEL DURING TWO
MEETINGS BETWEEN THE TRIAL
PROSECUTOR AND THE TRIAL JUDGE WAS
NEITHER CONTRARY TO, NOR AN
UNREASONABLE APPLICATION OF,
CLEARLY ESTABLISHED SUPREME COURT
LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

POINT TWO

PETITIONER'S CONFRONTATION CLAUSE
CLAIM IS BARRED IN THIS COURT BY AN
INDEPENDENT AND ADEQUATE STATE
PROCEDURAL GROUND. THE APPELLATE
COURT'S ALTERNATIVE DECISION DENYING
THE CLAIM ON THE MERITS IS NEITHER
CONTRARY TO, NOR AN UNREASONABLE

APPLICATION OF, CLEARLY ESTABLISHED
SUPREME COURT LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

A.   Petitioner's   Confrontation   Clause
     Claim is Procedurally Barred . . . . . . . . . . . . . . . . . . . . 37

B.   The Appellate Division's Decision was
     Neither   Contrary   to,   nor   an
     Unreasonable Application of, Clearly
     Established Supreme Court Precedent . . . . . . . . . . . . 46

POINT THREE

PETITIONER HAS FAILED TO ESTABLISH
THAT THE STATE COURT CONTRAVENED OR
UNREASONABLY APPLIED SUPREME COURT
LAW   IN   REJECTING   HIS   CLAIMS   OF
INEFFECTIVE ASSISTANCE OF APPELLATE
COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

TYRONE JOHNSON,                            :
                                           :

                 Petitioner,         :      AFFIDAVIT IN
                                         :      OPPOSITION
                                         :      TO PETITION
   -against-                            :      FOR A WRIT OF
                                         :      HABEAS CORPUS

SUPERINTENDENT PHILIP D. HEATH,    :
                                         :      CV-11-06270(ENV)

                Respondent,       :

-------------------------------------------------------------x

STATE OF NEW YORK)
                    ) ss.
COUNTY OF QUEENS  )

       **JOHNNETTE TRAILL**, an attorney admitted to practice in this

Court, being duly sworn, deposes and states as follows:

       1.  I am an Assistant District Attorney, of counsel to Richard A.

Brown, the District Attorney of Queens County.  I am submitting this affidavit

in opposition to the pro se undated application of Tyrone Johnson for a writ of

habeas corpus filed  in the United States District Court for the Eastern District

of New York.  I make the statements in this affidavit upon information and

belief, based on my review of the records and files of the Queens County

District Attorney's Office.

2. By agreement with the Attorney General of the State of New York, the District Attorney of Queens County represents respondent in this matter.

3. In compliance with the Court's March 1, 2012 Order to Show Cause, the state is submitting the following documents along with a courtesy copy of this return: (a) petitioner's November 15, 2005 section 440 motion; (b) the state's December 27, 2005 motion to strike and its response to the section 440.10 motion; ©) petitioner's March 9, 2006 reply (d) the state's April 5, 2006 sur-reply; (e) the transcripts of the hearing on petitioner's section 440 motion (f) petitioner's September 19, 2006 post-hearing memorandum of law; (g) the state's September 28, 2006 post-hearing memorandum of law; (h) petitioner's October 10, 2006 reply; the court's October 26, 2006 Decision and order denying petitioner's section 440 motion; (I) petitioner's November 21, 2006 motion for leave to appeal; (j) the state's December 22, 2006 opposition to leave to appeal; (k) the appellate court's January 22, 2007 decision and order denying leave to appeal; (l) petitioner's February 20, 2009 appellate brief and appendix; (m) the state's appellate brief in opposition; (n) petitioner's pro se November 2, 2009, and counsel's November 24, 2009, leave applications to the New York Court of Appeals; (o)the state's January 5, 2010 letter in opposition;

2

(p) petitioner's May 11, 2011 coram nobis motion; (q) and the state's June 11, 2011 opposition; and petitioner's November 4, 2011, and December 9, 2011 applications for leave to appeal the denial of the coram nobis motion.[1]

## FACTUAL AND LEGAL BACKGROUND

    4. Sometime during the day of February 4, 2000, petitioner paid Henry Hanley $100.00 to inform petitioner when Leroy Vann, who lived across the street from Mr. Hanley, was home. As a result of the arrangement, during the early morning hours of February 5, 2000, Mr. Hanley called petitioner on a walkie-talkie that petitioner had given him earlier to tell petitioner that Mr. Vann had just gotten home. A few minutes later, while sitting on the steps to his house, Mr. Hanley saw petitioner and someone named Shawn drive onto the block in a white Lincoln Navigator. Both men, armed with guns, approached Mr. Vann, and one of them tried to handcuff him. One of the men also asked Mr. Vann for keys. During the incident, Mr. Vann told the men that he was going to run his business however he wanted to and that the men would

---

[1] The New York Court of Appeals denied petitioner's application before the state could respond.

have to kill him.  As the assailants stood on either side of Mr. Vann, he turned towards petitioner, and the guns went off.  The men then fled.[2]

5.  Shot in the abdomen, Mr. Vann entered his house and fell down behind the couch.  He called out for his elderly mother, Mary Puryear, who came to his aid.  Because he said that he was burning up, his  mother began packing ice on his wound.  Mr. Vann told her that "Tyrone from the projects" shot him and that "they" had robbed him.  When Brenda Colfeld, the basement occupant and Ms. Puryear's home health care attendant, came to assist him, Mr. Vann also told her that "Tyrone" had shot him.  He said that "Tyrone" was from the projects near 121st Street and that he drove a white Navigator.  Mr. Vann also whispered to her that he was going to die.

6.  One of the police officers to arrive at the scene was John Blandino, who observed Mr. Vann bleeding profusely from a wound to his chest.  The officer asked Mr. Vann what had happened and he replied that "Ty" had shot him, that "Ty" drove a white Navigator, and that "Tyrone" lived near

---

[2] For his actions, Mr. Hanley was charged with Criminal Facilitation in the Fourth Degree.  He entered into an agreement with the Queens District Attorney's Office that called for him to testify truthfully in petitioner's case in exchange for thirty days' incarceration and reinstatement to the five-year probation that he was already serving in an unrelated case. Between the time he pled guilty and his testimony in petitioner's case, Mr. Hanley was convicted of robbery in New York County and sentenced to eight years.  At the time he testified, he was serving that sentence.

the projects at 121st Street. In the ambulance, Officer Blandino wanted to verify what Mr. Vann had previously told him while inside the house. As a result, the officer told Mr. Vann that he had a "big hole" in his chest and that he might not "make it" and that he should let the police "catch this person that did this to you." Mr. Vann again said that "Tyrone" did this to him, that he drove a white Navigator, that he frequented Mr. Vann's club, and that he was from 121st Street. The ambulance took Mr. Vann to the hospital, where he died soon after. A walkie-talkie and a set of handcuffs that were on Mr. Vann's wrist were recovered at the scene.

7. Petitioner was arrested on February 24, 2000, and subsequently charged with three counts of Murder in the Second Degree (one count depraved indifference, two counts felony murder) ( N.Y. Penal Law § 125.25[2][3]), Attempted Robbery in the First and Second Degrees (N.Y. Penal Law §§ 110.00/160.15[1]), Attempted Kidnaping in the Second Degree (N.Y. Penal Law §§ 110.00/135.20, two counts of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03[2]), and two counts of Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.04[2]) (Queens County Indictment Number 2002/00).

8. Petitioner was subsequently convicted after a jury trial before the Honorable Jaime A. Rios, Supreme Court, Queens County. The state, however, consented to a vacatur of this judgment of conviction after petitioner filed a motion to vacate the judgment pursuant to section 440.10 of the New York Criminal Procedure Law. It was discovered that the then-trial prosecutor failed to disclose to the defense the whereabouts of a Shanice Knight and had lied to the court when specifically asked if he knew her whereabouts. Ms. Knight, who lived in the same house as Mr. Hanley, had told the police that, from her house, she had seen a six-foot tall man approach Mr. Vann and that, after she had turned away, she heard gunshots. She had also failed to identify anyone in a photo-array that contained petitioner's photograph. In consenting to vacate the judgment of conviction, the District Attorney concluded that, while the failure to disclose Ms. Knight's whereabouts might not have affected the outcome of the trial, the prosecutor's conduct could not be condoned and that the District Attorney was consenting to the vacatur of petitioner's conviction so that, at a re-trial, petitioner would have a full and fair opportunity to present any witness he wished to call.[3]

---

[3] In support of his motion, petitioner had also obtained an affidavit from Henry Hanley, who claimed that he had never identified petitioner to the police, and that, instead, it was the police that pointed out petitioner's picture to him and identified petitioner by
(continued...)

9. The responsibility for re-trying the case was assigned to Assistant District Attorney Eugene Reibstein, who had been a prosecutor for over twenty years. At that point, ADA Reibstein had tried numerous felony indictments, including dozens of homicides. ADA Reibstein's title was Trial Coordinator for the Major Crimes Division that included, among others, the Homicide Trial Bureau. In this capacity, ADA Reibstein coordinated over 1000 felony cases, including many homicides. *See* Reibstein Affirmation at ¶¶ 2, 3.[4]

10. A few days before the adjourned date, ADA Reibstein knew that he would not be ready for trial given the problems in the case – Henry Hanley's recantation, for example – and he had determined to re-investigate the entire case. He thus needed more time. As a result, he called the defense attorney, Allen Brenner, to inform him that the state would not be ready on December 16th and that they were going to request an adjournment. Mr. Brenner, who lived in Long Island, but was working in Connecticut at that

---

(...continued)

name. According to Mr. Hanley, he never witnessed the shooting of Leroy Vann. Rather, he was home in bed with his girlfriend at the time of the shooting, and that it was his aunt, Shanice Knight, who told him about the shooting.

[4] ADA Reibstein's affirmation was attached to the state's response to petitioner's motion to vacate his subsequent judgment of conviction. *See* ¶20

time, informed ADA Reibstein that he did not want to come to Queens County solely for an adjournment, and that ADA Reibstein could adjourn the case without him being present. Both counsel also worked out a new date. Reibstein Affirmation at ¶¶ 3, 4.

11. Thus, on December 12, 2002, ADA Reibstein went into Justice Rios's courtroom to inform the court that the matter needed to be adjourned. Justice Rios was not on the bench so ADA Reibstein went into chambers. There, he informed Justice Rios that the People needed an adjournment because ADA Reibstein was re-investigating the case against defendant for evidence other than Henry Hanley. The judge responded that he did not blame the prosecutor because Mr. Hanley had not been a credible witness, particularly regarding the movement of cars at the scene. The remainder of the conversation was about issues unrelated to the case. Reibstein Affirmation at ¶ 5.

12. Subsequently, the matter was adjourned to January 16, 2003. Reibstein Affirmation at ¶ 5.

13. ADA Reibstein was not going to be ready for trial on that date either. So, as he did before, he contacted Mr. Brenner to inform him that the state would not be ready. Mr. Brenner again consented to ADA Reibstein

obtaining an adjournment without him being present. As a result, a few days before the adjourned date, ADA Reibstein went to Justice Rios's courtroom to adjourn the matter. There, he informed the clerk or the court attorney that Mr. Brenner had consented to the new adjourned date. Through his court attorney, Justice Rios informed the prosecutor that he should send a letter to Mr. Brenner, with a copy to the court, that the matter would be adjourned on consent. Reibstein Affirmation at ¶ 6.

14. Mr. Brenner, however, changed his mind and informed ADA Reibstein that Mr. Brenner would, in fact, appear in court on January 16th. ADA Reibstein, therefore, did not send a letter to the court. Reibstein Affirmation at ¶ 6.

15. On January 16th, the parties appeared before Justice Rios. On the record, Justice Rios stated that ADA Reibstein had represented to the court the week before that the matter was going to be adjourned on consent. Accordingly, the court said, it had directed the prosecutor, through its court attorney, to "memorialize that in a letter to defense counsel with a CC to the Court that was consistent with the discussion we had in December where I

informed the District Attorney[5] that they wouldn't be ready, rather than insist on Mr. Brenner's appearance, to notify in advance Mr. Brenner, this way defense counsel wouldn't have to appear." *See* January 16, 2003 Proceedings: 2-3. The court concluded that since Mr. Brenner was in court and the court did not receive a letter, it assumed that the prosecutor's information must have been incorrect. *Id*. at 3. And, the court stated, it wanted to put "that on the record so there's no suggestion that the Court had any ex-parte communications with anyone." *Id*. at 3.

16. The prosecutor acknowledged that the court's recitation of what had transpired was correct, but that Mr. Brenner had decided that he wanted to appear on that date. *Id*. The prosecutor then sought an adjournment until March 28th. Mr. Brenner, however, sought a shorter adjournment, until January 27th, because he intended to file a written bail application.[6] *Id*. at 4. Mr. Brenner never commented on the court's mention of a December discussion with the prosecutor. The case was then adjourned. *Id*. at 7.

---

[5] This should probably read "where I <u>was</u> informed <u>by</u> the District Attorney."

[6] Defense counsel wanted the matter adjourned to January 27th because he was going to be in Queens that day to testify in another matter. In explaining why he wanted that date, he told the court, "To be candid, I would like to avoid another trip to the county, if I can avoid it" (January 16, 2003 Proceedings: 5).

17.	In fact, the matter was adjourned several more times thereafter. The re-trial began with jury selection on June 30, 2003. At the conclusion of trial, the jury found petitioner guilty of all of the charges.

18.	After the jury's verdict, the prosecutor saw Justice Rios, who commented that the ADA had vouched for his witnesses during the summation and that that might be a problem in the Appellate Division. Reibstein Affirmation at ¶ 9.

19. On September 10, 2003, Justice Rios sentenced petitioner to concurrent indeterminate prison terms of from twenty years to life for the murder count and of from five to fifteen years for the manslaughter conviction. The court also sentenced him to concurrent determinate prison terms of fifteen years for the attempted first-degree robbery and second-degree weapon possession counts, seven years for the attempted second-degree robbery count, and two years for the third-degree weapon possession. Petitioner is incarcerated pursuant to this judgment of conviction.

## The Motion to Vacate Judgment

20.	Thereafter, petitioner, through counsel, moved to vacate his judgment of conviction in papers dated November 15, 2005, pursuant to section 440.10 of the New York Criminal Procedure Law. Attached to this

motion was a letter dated April 29, 2004, written by Judith Memblatt, Justice Rios's court attorney, to the State Commission on Judicial Conduct, making a series of unsworn complaints about Justice Rios's misconduct on the bench. *See* Memblett Letter attached to Petitioner's Motion as Defense Exhibit A. In the letter, Ms. Memblatt stated that the judge had informed her that he was terminating her employment and, she claimed, the termination was in retaliation for her efforts to "eradicate a conflict of interest," namely an affair between the judge and an assistant district attorney, who appeared before the judge in 1996, eight years before the letter was filed and six years before petitioner was re-tried.

21.    Ms. Memblatt also informed the Commission about an encounter that Justice Rios had with ADA Reibstein on December 12, 2002, without defense counsel present. According to Ms. Memblatt, the ADA entered the judge's inner office and left the door open. She did not hear what ADA Reibstein had to say, but because the judge spoke so loudly, she was able to hear the judge's part of the conversation. Without giving specifics, Ms. Memblatt stated that the judge "analyzed the first trial, focusing on inconsistencies that he perceived in the evidence pertaining to various cars at the scene," and that, he opined, "these inconsistencies were problematic to the

prosecution's case." The conversation lasted twenty minutes. Memblatt Letter at 5.

22. Ms. Memblatt also told of another encounter that the judge had with ADA Reibstein. According to Ms. Memblatt, the day after the jury verdict, ADA Reibstein went to Justice Rios's office without defense counsel present. Ms. Memblatt claimed that the judge told the assistant that the "new conviction would have to be reversed on appeal due to improprieties in Mr. Reibstein's summation (vouching for witnesses, etc.)." Ms. Memblatt opined for the Commission that, had Justice Rios shared this information with defense counsel, he would have filed a motion to vacate the verdict, which the judge would have to grant in accordance with his opinion that he had expressed to ADA Reibstein. Memblatt Letter at 5.[7]

---

[7] In a letter dated February 23, 2005, the Commission informed Ms. Memblatt that it had completed its review of her letter of complaint. It thanked her for advising it of the matter, "which enabled the Commission to take appropriate action." But, the Commission concluded, no further action was necessary. *See* Defense Exhibit D. In fact, in a page-three article in the New York Times printed on November 17, 2005, Robert H. Tembeckjian, the administrator of the State Commission on Judicial Conduct is quoted as saying that Justice Rios has never been disciplined by the Commission for having an sexual relationship with someone who appeared before him. According to comments made by Mr. Tembeckjian to the New York Law Journal, printed on November 17, 2005, on page 4, "an affair with a prosecutor who practiced in a judge's courtroom 'would be too serious to resolve with only a private caution.'"

23. Petitioner claimed in his motion that he was denied a fair trial because, during two "secret meetings" with the second trial prosecutor, Justice Rios "acted as an unofficial advisor to the prosecutor, suggesting ways that the case against [petitioner] should be improved and critiquing aspects of the prosecutor's presentation." Petitioner's 440 Motion at 2. According to petitioner, the prosecutor's and the judge's alleged misconduct rendered his trial fundamentally unfair, denied him the right to be present at all material stages of the proceedings, and denied him the right to the effective assistance of counsel. As a result, defendant claimed, his judgment of conviction should be vacated.

21. August 22, 2006, Justice Matthew D'Emic conducted a hearing on petitioner's claims.[8] Ms. Memblatt and Justice Rios (under subpoena) were called by the defense. In addition to reiterating the contentions that were in her April 29, 2004 letter, Ms. Memblatt testified that she had also heard Justice Rios discussing photographs of the crime scene with the

---

[8] By order of First Deputy Chief Administrative Judge Ann T. Pfau, Justice Matthew D'Emic, Supreme Court, Kings County, was transferred into Queens County to hear the matter.

prosecutor (Memblatt: 11-12, 71).[9]  Ms. Memblatt also admitted that from October 1995 through November 2001, she would surreptitiously remove documents from Justice Rios's desk without his permission and made photocopies of them (Memblatt: 36).  Justice Rios remembered that ADA Reibstein had come into his chambers to request an adjournment, but the judge had no recollection of discussing any facts from the first trial with the ADA (Rios: 108, 112-13, 124). Justice Rios also recalled ADA Reibstein coming to see him after the second trial was over.  During the conversation, ADA Reibstein thanked him for a "fair and efficient" trial and wished him luck on his new assignment in the civil term (Rios: 127).  Although the judge had no specific recollection of ever saying this, he might have "thrown [the prosecutor] a one liner" about what the Appellate Division might say in order to "bring him down to earth" (Rios: 128-29).

22.   As he swore in his December 23, 2005 affidavit, ADA Reibstein testified for the state that he entered the judge's chambers and requested an adjournment.  After the judge asked him when he would be ready to try the case,  ADA Reibstein responded that he did not know as he was still

---

[9] Page numbers preceded by a witness's name refer to the minutes of the Post-Conviction Hearing.

investigating whether there was sufficient evidence to continue the prosecution and that he was looking for "somebody besides Henry Hanley for this case" (Reibstein: 148-49). The judge then said that he did not blame the ADA because he had "had some doubts or something about Henry's credibility based on the last trial." ADA Reibstein did not focus on the judge's opinion about Mr. Hanley and remembered thinking at the time, "Oh good, he understands I am going to need time" (Reibstein: 149, 157). Justice Rios also said something about cars at the scene (Reibstein: 157).

23. As for the second conversation, ADA Reibstein testified that, after the verdict, he went into the courtroom to retrieve the trial exhibits. In the hallway behind the courtroom, he encountered Justice Rios, who told him that the judge thought that he might have "trouble" with the Appellate Division because of his summation as he had vouched for witnesses (Reibstein: 151-52, 162). ADA Reibstein testified that he remembered thinking, "What is he talking about? I didn't vouch for a single witness," and he told the judge that he did not think that there was a problem (Reibstein: 152, 162).

24. In a decision and order dated October 26, 2006, Justice D'Emic denied the motion in its entirety. First, crediting the testimony of ADA Reibstein, Justice D'Emic found that Justice Rios did not coach ADA

Reibstein about how to try the case. Rather, Justice D'Emic found as facts that ADA Reibstein went into the chambers to request an adjournment; the judge asked him when he would be ready; ADA Reibstein explained that he needed to conduct further investigation and expressed his dissatisfaction with the witness, Henry Hanley; and Justice Rios responded that Hanley was not a believable witness and stated the reasons why. Viewed in this light, Justice D'Emic concluded, the December 12, 2002 conversation -- which occurred six months before the actual trial -- was not a material stage of the trial for which petitioner had a right to be present (Decision: 9). And since this meeting was not a material stage, the court determined that petitioner had to show that he suffered actual prejudice in order to prevail, which he failed to do (Decision: 6-7, 10).

25. Second, the court concluded that petitioner was not denied the right to counsel because his attorney was not present at either the December 12th or the July 18, 2003 meeting. Counsel was not necessary at the December 12th conversation, the judge found, because, other than the granting of an adjournment, no decision was rendered, arguments made, or advantage gained (Decision: 10-11). Although the conversation strayed into "improper territory," Justice D'Emic stated that Justice Rios's comment regarding Hanley

was more a comment on "public testimony, already known to defense counsel, and the subject of [counsel's] cross-examination than anything else" (Decision: 10).

26. As for the July 18th conversation, Justice D'Emic concluded that Justice Rios's comment about the prosecutor's summation was "nothing more than an unsolicited gibe hurled at the prosecutor for no reason other than to deflate him," and was not a ground to vacate the conviction (Decision: 11).

27. Finally, Justice D'Emic rejected petitioner's claim that, by his comments, Justice Rios became a "stealth prosecutor" and demonstrated his bias for the prosecution. To the contrary, Justice D'Emic concluded, Justice Rios's statements were "critical of the prosecution's case in general, and of the prosecutor in particular" (Decision: 11).

28. By motion dated November 21, 2006, petitioner, through counsel, sought permission from the Appellate Division, Second Department, to appeal Justice D'Emic's October 26, 2006 decision. First, petitioner argued that leave should be granted for the court to consider whether the December 12th meeting constituted a material stage of the proceedings at which he had the right to be present. He also contended that the lower court erred in requiring him to show prejudice in order to succeed with his right-to-be-present claim.

Second, petitioner argued that this Court should consider whether he was denied the right to counsel at both the December 12th and the July 18th conversations.

29. In opposing, petitioner's application, the state pointed out that the lower court applied well-settled law in rejecting petitioner's claims.

30. In a decision and order dated January 22, 2007, Justice William Mastro of the Appellate Division, Second Department, denied petitioner's leave application.

## Petitioner's Direct Appeal

31. Defendant filed a timely notice of appeal and perfected that appeal, through counsel, in April of 2009. In his brief, counsel contended that petitioner was denied the right of confrontation when the court allowed into evidence Mr. Vann's statements to his mother, the home care attendant, and the police identifying defendant as the shooter. According to counsel, all of Mr. Vann's statements were testimonial in nature and, therefore, inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004).

32. In response, the state argued that petitioner had failed to preserve this issue for appellate review because at no time in the court below did he object to the admission of the statements on the basis that they were

testimonial. In any event, the state argued, the confrontation clause did not bar any of Mr. Vann's statements as he did not make them in response to any formal interrogation or under any circumstances that resembled the pre-trial examinations in England that the framers of the Sixth Amendment intended to prohibit.

33. In a Decision and Order dated October 6, 2009, the Appellate Division, Second Department, affirmed petitioner's judgment of conviction. *People v. Johnson*, 66 A.D.3d 703 (2d Dept. 2009). The court found, first, that petitioner failed to preserve for appellate review his contention that he had been denied his constitutional rights to confront the witnesses against him because the victim's statements were testimonial. Second, the court held that, in any event, the victim's statements to his mother and the tenant, as well as the initial statements to the police officer who responded at the scene, were not testimonial. And to the extent that the victim's subsequent statements to the police officer may have violated *Crawford v. Washington*, 541 U.S. 36 (2004), the court concluded that any error was harmless in light of the overwhelming evidence of defendant's guilt. *People v. Johnson*, 66 A.D.3d at 703-704.

34. Counsel thereafter sought leave from the New York Court of Appeals to appeal this decision. Judge Susan Read denied that application on

February 17, 2010. *People v. Johnson*, __ N.Y.3d __, 898 N.Y.S.2d 103 (2010).

## The Coram Nobis Motion

35. Next, in a motion dated May 11, 2011, petitioner, by new counsel, moved in the Appellate Division, Second Department, for a writ of error coram nobis on the ground that appellate counsel was ineffective for failing to raise two additional meritorious claims. According to petitioner, appellate counsel should have raised a claim the trial counsel erroneously admitted a portion of a police report by Police Officer Robert Blandino that bolstered the officer's testimony concerning one of the victim's statements. Second, petitioner argued that appellate counsel should have raised a claim that the trial court improperly failed to correct an inaccurate readback that the court had agreed to correct.

36. The state responded that appellate counsel's failure to raise either of these claims did not render his assistance ineffective and, in fact, his representation more than satisfied the federal and state standards for effective assistance of counsel. It is an appellate attorney's duty, the state argued, to select those issues, which in the attorney's opinion, are most viable and counsel is not obligated to raise every possible claim of error. In any event, the

state argued that neither of the claims that petitioner suggested should have been raised would have resulted in reversal of his judgment of conviction, and it was a sound exercise of professional judgment to omit the claims from the appellate brief.

37. On September 27, 2011, citing to *Jones v. Barnes*, 463 U.S. 745 (1983), the Appellate Division denied petitioner's application, concluding that he had failed to demonstrate that he had received the ineffective assistance of appellate counsel. *People v. Johnson*, 87 A.D.3d 1161 (2d Dept. 2011).

38. Petitioner thereafter sought leave to appeal this decision to the New York Court of Appeals. That court denied leave on December 15, 2011. *People v. Johnson*, 18 N.Y.3d 859 (2011) (Graffeo, J.).

## The Current Petition

39. In his pro se application for a writ of habeas corpus, petitioner contends, first, that the trial court erred in allowing into evidence testimony about the victim's statements to his mother, her home health aide, and police officers. Petitioner claims that the statements were not only testimonial, but that they also did not fall into any recognized hearsay exception. Second, petitioner claims that he was denied the rights to counsel and to be present at two ex parte meetings with the trial judge and the prosecutor during which they

discussed substantive matters regarding the evidence at trial. Third, petitioner argues that he was denied the effective assistance of appellate counsel owing to counsel's failure to raise claims on appeal about the erroneous admission of prior inconsistent statements at trial and the trial court's refusal to respond to the jury's request for a readback.

40. This Court should deny petitioner's application. First, petitioner's Confrontation Clause claim is procedurally barred from review in this Court by an adequate and independent state procedural ground. Even though the state appellate court reviewed the merits of this claims in the alternative, it nonetheless explicitly held first that petitioner's claim that the trial court improperly allowed into evidence certain statements by the decedent to his mother, her home attendant, and the police was not properly preserved for appellate review. *People v. Johnson*, 66 A.D.3d 703 (2010). And because petitioner cannot show both cause for his procedural default and resulting prejudice, or that a fundamental miscarriage of justice would occur if this Court does not review the merits of the claim, he is not entitled to habeas corpus review of them. In any event, even if not procedurally barred, petitioner is not entitled to habeas relief because he cannot show that the state's court's

alternative decision that denied the claim on the merits was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

41.     Similarly, petitioner cannot succeed with his second contention -- that he was denied the right to be present and the right to counsel by his exclusion at two meetings between the trial court and the trial prosecutor -- because he also cannot show that the state court's decision rejecting this claim either contravened or misapplied clearly established Supreme Court precedent especially in light of the state court's findings that neither interactions between the judge and the prosecutor constituted a material stage of the trial.

42.  Finally, because the state appellate court reasonably applied clearly established Supreme Court law when it rejected petitioner's claim that he was denied the effective assistance of appellate counsel, he is not entitled to the issuance of the writ on this basis.

WHEREFORE, and for the reasons set forth in the attached Memorandum of Law, the Court should summarily deny the petition for a writ of habeas corpus.

_____

Johnnette Traill
Assistant District Attorney
(718) 286-5862

Sworn to before me this
___ day of May 2012

_____

Notary Public

To:   Tyrone Johnson
      02-A-5029
      Sing Sing Correctional Facility
      354 Hunter Street
      Ossining, New York 10562

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------x

TYRONE JOHNSON, : MEMORANDUM OF
: LAW IN OPPOSITION
           Petitioner, : TO PETITION FOR
: A WRIT OF HABEAS
    - against - : CORPUS
:
SUPERINTENDENT PHILIP D. HEATH, :
:
           Respondent. :

--------------------------------------------------------x

       This Memorandum of Law, together with the accompanying

Affidavit, is submitted in opposition to petitioner's pro se application for a writ

of habeas corpus.

## POINT ONE

**THE STATE COURT'S REJECTION OF PETITIONER'S CLAIMS THAT HE WAS DENIED THE RIGHT TO BE PRESENT AND RIGHT TO COUNSEL DURING TWO MEETINGS BETWEEN THE TRIAL PROSECUTOR AND THE TRIAL JUDGE WAS NEITHER CONTRARY TO, NOR AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED SUPREME COURT LAW (Responding to Ground Two of the Petition).**

       The state court's decision, after an extensive hearing, that the two

ex parte communications between the trial court and the prosecutor did not

constitute a material stage of the trial and, thus, did not violate petitioner's right to be present nor his right to counsel was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Indeed, the state court's factual findings that the first communication, which occurred six months prior to the trial, was for the purpose of adjourning the matter with defense counsel's consent, and that the second communication occurred after the trial was over and involved an unsolicited criticism of the prosecutor by the trial court supported its conclusion that neither communication concerned non-ministerial matters for which petitioner had the right to be present or had the right to counsel. Petitioner's claim to the contrary is wrong.

A state prisoner's habeas corpus petition "shall not be granted with respect to any claim that was adjudicated on the merits" in state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established" Supreme Court law. 28 U.S.C. § 2254(d)(1). Moreover, the state court factual determinations are presumed correct, and the petitioner has the burden of rebutting this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court adjudicates a federal claim on the merits when it disposes of the claim "on the merits," and reduces its disposition to judgment.

*Sellan v. Kuhlman*, 261 F.3d 303, 309 (2d Cir. 2001). When the state court does so, a federal habeas court must defer to the state court's decision in the manner prescribed in section 2254(d)(1) even if the state court does not explicitly refer to the federal claim or to relevant federal case law. *Id.*; *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770 (2011).

Under the "contrary to" clause, the writ may issue in two circumstances: first, if the state-court decision is contrary to Supreme Court precedent on a question of law; and, second, if the state-court decision addresses a set of facts "materially indistinguishable" from a relevant Supreme Court case and arrives at a result opposite to that reached by the Court. *Williams v. Taylor*, 529 U.S. 362, 404-406 (2000). According to the Supreme Court, "[a]voiding these pitfalls does not require citation to [their] cases – indeed, it does not even require *awareness* of [their] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

A state court decision involves an unreasonable application of Supreme Court precedent when the state court either "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts" of the case or, "unreasonably extends a legal principle

from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. at 406-407.

An "unreasonable application" inquiry, however, is limited and is a substantially high standard to meet as it is "highly deferential" to the state court's determination. In this regard, a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, __ U.S. at __, 131 S. Ct. at 786, *citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[A] habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Id.* Accordingly, the authority to issue the writ extends to "cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents." *Id.* Thus, "[e]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* Here, applying section 2254's deferential standard, petitioner cannot show that the writ should issue on the

basis of his claim that he was denied the right to be present and the right to counsel.

Initially, the 440 Court's decision rejecting petitioner's claims on the merits constitutes an adjudication on the merits and is, therefore, entitled to section 2254's deference. And applying that highly deferential standard, petitioner cannot show that the 440 Court's decision either contravened or unreasonably applied clearly established Supreme Court precedent.

According to the Supreme Court, a criminal defendant has a federal due process right to be present during a specific stage of trial only when his absence would have a "substantial effect on his ability to defend against the charges," *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934). Not only must the defendant show that his presence would have contributed to the fairness of the process, he must also demonstrate that the proceeding itself was critical to the outcome of the criminal proceeding. *Kentucky v. Stincer*, 482 U.S. 730 (1987). As a result, a defendant's presence is not required when it would "be useless, or the benefit of but a shadow." *Snyder v. Massachusetts*, 291 U.S. at 106-07.

Applying these principles here, the 440 Court reasonably concluded that petitioner had no right to be present during the prosecutor's

conversation with the trial judge to discuss an adjournment. Indeed, the 440 Court found as facts that the prosecutor met with the trial judge, with defense counsel's consent, to inform him that the state was not ready to proceed with the re-trial on the next adjourned date because it had decided to re-investigate the case against petitioner and needed an adjournment to complete the re-investigation. In explaining why he needed the time, the prosecutor said that he hoped to find evidence besides Henry Hanley. The judge agreed to the adjournment (Decision: 3).

This meeting, solely for the purpose of adjourning the case, as the 440 Court concluded, was clearly not a core proceeding of the trial at which petitioner's presence was required. It certainly had nothing to do with the outcome of the trial. Nor did petitioner, himself, have anything valuable to contribute to this meeting. In fact, petitioner had no say over the state's decision to re-investigate the case against him nor the trial court's decision to adjourn the matter. And, finally, the communication between the judge and the prosecutor had absolutely no effect, substantial or otherwise, on petitioner's ability to defend against the murder charges. In short, the conversation concerned procedural matters for which petitioner had no right to participate.

Similarly without merit is petitioner's claim that he was denied the right to counsel because counsel was not present at either the December 2002 discussion with the trial judge or a subsequent conversation, after the trial was over, during which the judge told the prosecutor that he had vouched for his witnesses in his summation. For much of the same reasons why petitioner had no right to be present during the December 2002 conversation, he had no right to counsel at either of the conversations in issue.

There is no question that a criminal defendant has the right to counsel at every critical stage of the criminal proceeding. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). But petitioner here was not denied that right because counsel was not present for the December 2002 conversation or the one after the verdict. Indeed, not only was the December 2002 conversation, held some six months before the trial, not a critical stage of the proceeding, but counsel had consented to the prosecutor speaking to the judge. As counsel indicated in an affidavit, he did not want to come to Queens solely for the case to be adjourned, so he authorized the prosecutor to obtain the adjournment. Petitioner, therefore, has no basis to claim that he was denied the effective assistance of counsel because counsel was not there.

Moreover, the conversation that occurred after the verdict definitely was not at a critical stage of the proceeding because the trial was over and it could not possibly have affected petitioner's ability to defend against the charges. Nor was counsel entitled to know about the judge's opinion about the prosecutor's summation. Indeed, counsel and petitioner were both present when the prosecutor gave his summation so there was nothing preventing counsel from concluding for himself that the summation had been improper.[10] Accordingly, petitioner has no basis to argue that he was entitled to have his counsel hear the judge's opinion about the prosecutor's summation.

Finally, petitioner has failed to show how he was prejudiced by his absence at either meeting. *See Yarborough v. Keane*, 101 F.3d 894 (2d Cir. 1996) (absence of the defendant from a peripheral proceeding of secondary importance is subject to harmless error review)*; United States v. Fontanez*, 878 F.2d 33, 37-38 (2d Cir. 1989) (subjecting presence violations to harmless error analysis where defendant was absent during read back of jury instructions and

---

[10] Moreover, counsel raised only one objection to the prosecutor's summation, and that objection dealt with the prosecutor commenting on petitioner's failure to call a particular witness. He, therefore, did not share the judge's opinion that the prosecutor had vouched for his witnesses in the summation.

giving of modified *Allen* charge, but finding that error was not harmless); *United States v. Toliver*, 541 F.2d 958, 964-66 (2d Cir. 1976)(defendant's absence during the testimony of two witnesses was harmless). Here, the judge's and prosecutor's brief discussion did not prejudice petitioner for several reasons. First, the judge's comment that Mr. Hanley had credibility problems was in no way a revelation to ADA Reibstein, or to even the most casual of observers, considering that Mr. Hanley never came forward as an eyewitness right after the murder, that he ran from the police when they tried to talk to him, that he gave four different written statements to the police before relaying everything that he saw, and that he promptly recanted in a sworn affidavit his testimony from the first trial as soon as that trial was over. Indeed, ADA Reibstein himself recognized the credibility problems before Justice Rios even mentioned them. Thus, the court agreeing with the prosecutor that Mr. Hanley had credibility problems could not have been a surprise to ADA Reibstein nor defense counsel.

Second, petitioner cannot show that anything that the judge said to ADA Reibstein in December 2002 affected the manner in which the prosecutor tried the case six months later. Indeed, after the prosecutor conducted the re-investigation, the matter was re-tried, and the prosecutor

called Henry Hanley as a witness and he was impeached extensively about his prior inconsistent statements, including his recantation. Accordingly, nothing that the court said about Mr. Hanley caused the prosecutor not to rely on him as a witness or to alter the manner in which the prosecutor tried the case. The court's expressing its opinion about Mr. Hanley's credibility in this context, therefore, was not improper, and certainly did not deny defendant a fair trial.

Third, the judge's comments about Mr. Hanley's credibility in no way indicated that he favored any side, much less the prosecution's. In fact, to the extent that the judge's personal belief that a witness was not credible is relevant in the context of a jury trial, the court's belief here inured to defendant's benefit because it concerned his doubts about a prosecution witness.

Moreover, petitioner cannot show any prejudice from the meeting that occurred after his trial was over and the jury had already found him guilty.

In sum, the 440 Court's decision that petitioner was not denied the right to counsel or to be present at either ex parte communication between the trial court and the prosecutor neither contravened nor unreasonably applied clearly established Supreme Court precedent. The writ, therefore, cannot be granted on either of these grounds.

## POINT TWO

**PETITIONER'S CONFRONTATION CLAUSE CLAIM IS BARRED IN THIS COURT BY AN INDEPENDENT AND ADEQUATE STATE PROCEDURAL GROUND. THE APPELLATE COURT'S ALTERNATIVE DECISION DENYING THE CLAIM ON THE MERITS IS NEITHER CONTRARY TO, NOR AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED SUPREME COURT LAW (Responding to Ground One of the Petition).**

The State court's rejection of petitioner's claim – that the admission into evidence of the dying victim's statements violated petitioner's confrontation rights because the statements were testimonial under *Crawford v. Washington*, 541 U.S. 36 (2004) – on the basis that petitioner failed to preserve it for appellate review constitutes an adequate and independent ground that bars review of the claim in this Court. And because petitioner is unable to establish both cause excusing his procedural default and that he will be prejudiced if this Court does not review the claim, or, alternatively, that a fundamental miscarriage of justice will result from non-review of the claim, he cannot overcome the bar to obtain review of the claim. In any event, the appellate court's alternative decision to reject the Confrontation Clause claim on the merits is entitled to section 2254's deference, and petitioner has not

shown that it was contrary to, or an unreasonable application of clearly established Supreme Court law.

## A. Petitioner's Confrontation Clause Claim is Procedurally Barred.

The state appellate court's decision to reject petitioner's claim that the admission of the dying victim's statements violated petitioner's confrontation rights because he failed to preserve it for appellate review constitutes in this Court an independent and adequate procedural bar to the claims. A federal habeas court will not review a claim rejected by a state court if the decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Beard v. Kindler*, 558 U.S. ___, 130 S. Ct. 612 (2009), *quoting Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *see Walker v. Martin*, __ U.S. __, 131 S. Ct. 1120 (2011). In this regard, a state court's reliance on a state procedural ground as a basis for rejecting a claimed violation of a state prisoner's constitutional rights constitutes such an "adequate and independent state ground" that generally precludes federal habeas review. *Harris v. Reed*, 489 U.S. 255 (1989); *see Engle v. Issac*, 456 U.S. 107, 124-25 (1982) (failure to make contemporaneous objection to jury instructions in compliance with state law constitutes a

procedural default); *Rosenfield v. Dunham*, 820 F.2d 52, 54 (2d Cir. 1987), *cert. denied*, 484 U.S. 968 (1987) ("[w]hen a state appellate court refuses to consider the merits of a petitioner's claims on account of his procedural failure to preserve his rights by objection at the time, then a federal court may not review those merits in a collateral habeas corpus proceeding"). This procedural bar is applicable only in cases when the last reasoned state court decision contains a "plain statement" that the state court is relying, at least in part, on the applicable state procedural rule in deciding the claim. *Harris v. Reed*, 489 U.S. at 263-65; *but see Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Coleman v. Thompson*, 501 U.S. at 335-40.

Here, the Appellate Division's decision contains a plain statement that it was rejecting petitioner's Confrontation Clause claim based on his failure to comply with state procedural rules. In its October 6, 2009 decision, the court held that petitioner's claim that the admission of the dying victim's statements violated petitioner's confrontation rights under *Crawford v. Washington* was not preserved for appellate review because petitioner failed to argue in the trial court that the statements were testimonial. *People v. Johnson*, 66 A.D.3d 703 (2d Dept. 2009). Section 470.05(2) of the New York Criminal Procedural Law prohibits a party from appealing a ruling or

instruction of the trial court unless the party objected to the ruling or instruction when the court had an opportunity of effectively changing it. Thus, having relied on state procedural rules, the state appellate court decision was independent from federal law.

Moreover, the rule was adequate to support the Appellate Division's decision as it is firmly established and regularly followed. Indeed, New York courts have consistently held that, to preserve for a question of law regarding a Confrontation Clause claim for appellate review, a defendant must make a specific objection at trial in order to offer the court an opportunity to cure any error. *People v. Gray*, 86 N.Y.2d 10 (1995); *People v. Fleming*, 70 N.Y.2d 947 (1988); *see* N.Y. Crim. Proc. Law § 470.05(2). Nor does it make a difference here that petitioner's claim was based on caselaw that was decided after his conviction as he still had to raise an objection to preserve his claim. In *People v. Lopez*, 25 A.D.3d 385 (1st Dept. 2006), the court held that, although that defendant's trial occurred before the decision in *Crawford v. Washington*, that did not affect the defendant's obligation to properly object on constitutional grounds. The Fourth Department also reached a similar conclusion in *People v. Evans*, 59 A.D.3d 1127 (4th Dept. 2009), that the fact that the defendant's trial occurred before *Crawford* had no bearing on the

preservation requirement. *See People v. Rivera*, 33 A.D.3d 450 (1ˢᵗ Dept. 2006). Indeed, the Court of Appeals has never recognized an exception for new or novel claims that are based on new caselaw. As the Court of Appeals has repeatedly made clear, there exists only one narrow exception to the rule of preservation, the one for errors that affect the organization of the courts or the mode of proceedings prescribed by law, *see, e.g., People v. Gray*, 86 N.Y.2d 10, 21 (1995), and the evidentiary issue in this case does not fall within that exception. *See, e.g., Kello*, 96 N.Y.2d 740 (2001). Thus, the Appellate Division's decision here to require petitioner to have preserved his claim even before the *Crawford* decision is firmly established and regularly followed. Thus, here, the Appellate Division was simply adhering to a state procedural rule that was firmly established and regularly followed. The rule was therefore adequate to support the appellate court's decision. *See Downs v. Lape*, 657 F.3d 97 (2D Cir. 2011) (Second Circuit has repeatedly held that New York's contemporaneous objection rule is a firmly established and regularly followed procedural rule).

Although the appellate court alternatively ruled on the merits of the claim, it is nonetheless procedurally barred from review in this Court. "[A] state court need not fear reaching the merits of a federal claim in an *alternative*

holding." *Harris v. Reed*, 489 U.S. at 264 n.10 (emphasis in original); *see also Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990). "Under *Harris*, federal habeas review is precluded 'as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision.'" *Velasquez v. Leonardo*, 898 F.2d at 9, *quoting Harris v. Reed*, 489 U.S. at 264 n.10. And, here, as mentioned above, the appellate court explicitly invoked the preservation rules in rejecting petitioner's claims.

Nor does the New York Court of Appeals' subsequent decision summarily rejecting petitioner's application to appeal the Appellate Division's decision mean that that court considered the merits of petitioner's claim. When faced with a silent rejection of a claim in the state court, the habeas court must "look through" that decision to the "last reasoned opinion" issued in the state court. *Ylst v. Nunnemaker*, 501 U.S. at 803; *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993). If "the last reasoned opinion on the claim explicitly imposes a procedural default, [then a habeas court] will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Ylst v. Nunnemaker*, 501 U.S. at 803. Thus, here, because the Appellate Division rejected on procedural grounds petitioner's Confrontation Clause claim and the New York Court of Appeals has no power to review unpreserved

claims, *People v. Liccione*, 50 N.Y.2d 850, 851 (1980), there is no reason to doubt that the New York Court of Appeals, like the Appellate Division before it, relied on the procedural bar to reject petitioner's application.

Additionally, if a claim has been procedurally defaulted in state court, a federal court may address its merits only if the petitioner can show both cause for the procedural default and that he will be prejudiced by non-review of the claim or -- alternatively -- that a fundamental miscarriage of justice will occur if the court does not review the claim. *See Murray v. Carrier*, 477 U.S. 478, 485, 492 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994). Constitutionally ineffective assistance of counsel can constitute cause, but only if an independent Sixth Amendment claim has been previously submitted to the state courts. *See Edwards v. Carpenter*, 529 U.S. 446 (2000); *Murray v. Carrier*, 477 U.S. at 488. The alleged ineffective-assistance-of-counsel claim must be exhausted like any other federal constitutional claim, even if the claim is being raised only to establish "cause" to excuse a procedural default regarding an unrelated constitutional claim. *Id.*; *Murray v. Carrier*, 477 U.S. at 488-491.

In addition to showing cause to excuse a state procedural default, a petitioner must also establish that he will be prejudiced if the Court does not

review his defaulted claim.  Although the Supreme Court has not defined what it means by "prejudice," it has suggested that prejudice is established by showing that, but for the default, there is a reasonable probability that the outcome of the relevant proceeding would have been different.  *See Strickler v. Greene*, 527 U.S. 263 (1999).  It stands to reason, therefore, that a petitioner cannot establish prejudice when the alleged constitutional claim is without merit.  *Capiello v. Hoke*, 698 F. Supp. 1042 (E.D.N.Y.), *aff'd*, 852 F.2d 59 (2d Cir. 1988).

In this case, petitioner has not even attempted to establish either cause for his procedural default or that he would be prejudiced should the Court not review his claim.  Indeed, petitioner does not, and cannot, rely on any claim of ineffective assistance of trial counsel as cause for the procedural default of the prosecutorial misconduct claims because petitioner did not exhaust an independent ineffective-assistance-of-trial-counsel claim in state court.  *See Edwards v. Carpenter*, 529 U.S. at 452.   And because petitioner has not alleged cause for the procedural default, this Court need not even address whether petitioner would be prejudiced by non-review of the claim. *See Murray v. Carrier*, 477 U.S. at 498 (federal courts should adhere to the "cause and prejudice test" in the conjunctive); *Francis v. Henderson*, 425 U.S.

536, 542 (1976) (requiring not only a showing of cause for the procedural default, but also a showing of actual prejudice). In any event, petitioner could never show that he would be prejudiced should the Court not review his claim about the prosecutor's misconduct because, as discussed below, the claim has no merit. Moreover, should the Court conclude that the Appellate Division's decision does not rest on an independent and adequate state procedural ground, it should, nonetheless, reject the claims because petitioner cannot show that the Appellate Division's merits decision was contrary to, or an unreasonable application of, clearly established Supreme Court law.

Nor would there be a fundamental miscarriage of justice should the Court not review petitioner's claim. The Supreme Court has held that the "miscarriage of justice" exception extends to cases of "actual innocence," that is, when the constitutional violation "has probably resulted in the conviction of one who is actually innocent [of the offense of which he has been convicted]." *Murray v. Carrier*, 477 U.S. at 496; *see Schlup v. Delo*, 513 U.S. 298 (1995). "To be credible," an actual innocence claim requires a petitioner to present "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup v. Delo*, 513 U.S. at 324. To meet this test,

the petitioner must show that it is "more likely than not that no reasonable juror would have convicted" him if the constitutional error had not occurred, *Schlup v. Delo*, 513 U.S. at 327-28, or, "to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006). As the Supreme Court describes it, "the *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *Id.*

Here, petitioner's case is far from extraordinary. Independent of the victim's statement's identifying a "Tyrone" as his shooter, petitioner was identified by an eyewitness, Henry Hanley, who had informed petitioner that the victim had arrived home and had then witnessed petitioner shoot the victim. Petitioner therefore cannot show that he is actually innocent of the crimes charged. Under these circumstances, therefore, petitioner cannot meet the *Schlup* standard and he cannot use this ground as a basis for this Court to overlook the procedural default and consider the merits of his Confrontation Clause claim.

In short, this Court should not review petitioner's Confrontation Clause claim because they are procedurally barred from review. Indeed, the appellate court expressly relied on New York's preservation rules when it

considered petitioner's claim. That reliance is both independent from a determination of federal law and adequate to support the judgment. And because petitioner cannot show both cause for his procedural default and that he would suffer prejudice from non-review of the claims, or that he would suffer a miscarriage of justice, this Court should not review petitioner's procedurally defaulted claim.

**B.    The Appellate Division's Decision was Neither Contrary to, nor an Unreasonable Application of, Clearly Established Supreme Court Precedent.**

_____The Appellate Division reasonably concluded, in the alternative, that petitioner's Confrontation Clause claim was without merit. Because the court adjudicated the merits of this claim, the writ can only issue on these bases if petitioner shows that the Appellate Division decision was contrary to, or an unreasonable application of, clearly established Supreme Court law. Petitioner, however, has not made such a showing and he, therefore, is not entitled to issuance of the writ.

As stated in Point One, this Court cannot grant the writ unless the state court's adjudication of petitioner's Confrontation Clause claim was contrary to, or an unreasonable application of clearly established Supreme Court law. And it "requires the federal courts to . . . measure state-court

decisions 'against th[e Supreme] Court's precedents as of "the time the state court renders its decision."'" *Greene v. Fisher*, __ U.S. __, 132 S. Ct. 38, 44 (2011), *quoting Cullen v. Pinholster*, 563 U.S.  __, 131 S. Ct. 1388, 1399 (2011).[11]  The applicable Supreme Court cases here are *Crawford v. Washington*, *supra*, and *Davis v. Washington*,  547 U.S. 813 (2006).  In *Crawford v. Washington*, the United States Supreme Court interpreted anew the confrontation clause, relying on a historical analysis of the right of confrontation as understood by the framers of the constitution to hold that the Confrontation Clause bars hearsay statements that are testimonial.  Concluding that the "core concern" of the Confrontation Clause was the admission of "testimonial" statements against the accused, the Court ruled that such statements could not be introduced unless the declarant was unavailable and the defendant had a prior opportunity to cross-examine The Supreme Court, however, declined to define the term "testimonial" with any specificity, leaving that task to "another day." *Id.* at 68.

---

[11] For this reason, any Supreme Court case that dealt with testimonial statements that were decided after the Appellate Division decision in petitioner's case like *Michigan v. Bryant*, 526 U.S. __, 113 S. Ct. 1143 (2011) and *Bullcoming v. Mexico*, __ U.S. __, 131 S. Ct. 2705 (2011), for example, are not relevant to the resolution of this petition.

Later, in *Davis v. Washington*, the Supreme Court made clear that not all accusatory statements given to law enforcement officers are testimonial. Rather, the Court posited a "primary purpose" test, holding that statements made for a purpose independent of prosecution, such as when "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," are not testimonial because they do not resemble the examinations by justices of the peace that caused the framers to enact the confrontation clause. *Id.* On the other hand, the Court concluded, statements are testimonial when there is no ongoing emergency and the police's primary purpose of the interrogation was to "establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. at 822. The *Davis* Court concluded that, because the statements in that case, which included direct accusations that the defendant committed crimes, had a purpose independent of law enforcement, they were not testimonial. The Supreme Court in *Davis* also resolved one other question that it had left open in *Crawford*; it concluded that non-testimonial statements are not subject to the confrontation clause at all. *Id.* at 821.

The Appellate Division neither contravened this precedent nor unreasonably applied it when it rejected petitioner's Confrontation Clause claim on the merits. Here, applying these principles, there is no question that

Leroy Vann's statements to his mother, the home care attendant, and the police officer were not testimonial in nature and, thus, were properly admitted at trial. First, Mr. Vann's statements to his mother and her home care attendant did not violate petitioner's confrontation rights because they were made to civilian witnesses. Indeed, statements to civilians ordinarily do not resemble examinations by justices of the peace. They are not the subject of any inquiry and are not part of any formal process. Further, civilian statements also ordinarily do not involve the government and, thus, *Crawford's* concern with testimony created by the government with an eye towards trial is not present. And a person making a statement to a civilian most often does not expect that comment to be used prosecutorially and thus, this type of statements fall outside even a broad definition of testimonial statements. Moreover, neither the decedent's mother nor the home attendant conducted any interrogation, formal or otherwise, of Mr. Vann when they went to his assistance. Rather, upon discovering that he had been shot, they immediately went to his aid and tried to alleviate his pain by packing ice onto his wound. And other than asking him what was wrong (Puryear: 500; Colfeld: 1110), neither woman asked him any questions, much less ones designed to elicit information for

future criminal prosecution.   As such, Mr. Vann's statements to the women were not testimonial and, therefore, not precluded by the Confrontation Clause.

Similarly, Mr. Vann's statements to Police Officer Blandino were not testimonial because the officer's primary purpose was to deal with what he reasonably believed was an ongoing emergency and to prevent further harm. The officer certainly was not seeking to establish facts regarding a past event with an eye towards the criminal prosecution of the perpetrator.  Indeed, an officer initially arriving at the scene in response to a 911 call, who often faces the possibility of encountering an ongoing crime, must first determine what is occurring at the scene and whether any immediate help is needed.  The officer must initially make inquiries regarding whether the crime is still ongoing, whether the perpetrator is nearby, whether he poses a threat either to those reporting to the officer or to the officer himself, and whether anyone is injured and requires immediate treatment.

Here, in response to a call about a male being shot, Officer Blandino arrived at Mr. Vann's house within one minute to find him lying in between the doorway and the stoop.  After quickly ascertaining that there was no one else inside the house, the officer stepped back outside and asked what had happened (Blandino: 601).  After Mr. Vann said that "Ty" did this to him,

the officer asked him "Ty who?" Mr. Vann responded, "Ty" drove a white Navigator and that he was from 121st Street by the projects. Under these circumstances, the officer's brief solicitation of information about the shooter's identity was part of his reasonable efforts to assess what had happened to cause Mr. Vann's injuries and whether there was any continuing danger to himself, other officers, and the victim and his family because, after all, the shooting had just occurred and the officer had no knowledge of the shooter's whereabouts. Officer Blandino's primary purpose, therefore, was to find out the nature of the attack in order to determine the best course of action necessary to prevent further harm. Indeed, from Mr. Vann's statement, Officer Blandino initially thought that the armed perpetrator had fled towards the projects and the officer radioed his fellow officers to look for a white Lincoln Navigator near 121st and Sutphin Boulevard (Blandino: 602-03).

As for the victim's statements in the ambulance, the Appellate Division concluded that to the extent they may have violated *Crawford*, any error was harmless beyond a reasonable doubt. Inside the ambulance, the officer said to Mr. Vann that he had a "big hole" in his chest, that he might not "make it," and that he should help the police find the person who had shot him (Blandino: 605). With the exception of the statement that "Ty" frequented his

club, Mr. Vann simply reiterated what he had already told the officer when the officer first arrived at the scene: that "Ty" who drove a white Navigator had shot him (Blandino: 605-606). Any error in the admission of these mostly redundant statements did not have a substantial or injurious effect on the verdict. *See Brecht v. Abramhamson*, 507 U.S. 619 (1993); *see also Bradley v. Meachum*, 918 F. 2d 338, 343 (2d Cir.), *cert. denied*, 501 U.S. 1221 (1990). The standard used to assess harmlessness on habeas review is different from the standard used on direct appeal. A constitutional error is harmless, for purposes of habeas review, unless it had a "substantial and injurious effect" on the verdict. *Fry v. Pliler*, 551 U.S.112 (2007); *Brecht*, 507 U.S. at 623. This standard is more difficult for a petitioner to meet than the ordinary standard applicable on direct appeal under *Chapman v. California*, 386 U.S. 18 (1967), which requires a showing that the error was "harmless beyond a reasonable doubt."

Here, without the victim's statements to the officer in the ambulance, the evidence of petitioner's guilt was overwhelming. Henry Hanley, who lived across the street from Mr. Vann, testified that petitioner paid him to alert petitioner when Mr. Vann got home. After Mr. Hanley did so, petitioner and another men, both armed with guns, approached the victim as he

was getting out of his car in front of his house. Mr. Hanley watched from across the street as petitioner and his accomplice filed several shots at the victim. Moreover, after he was shot and lay dying, Mr. Vann told his mother and her home care attendant that "Tyrone" from the projects near 121st Street and who drove a white Lincoln Navigator had shot him. Second, the prosecution also established that petitioner lived on 153-15 122nd Street, which was one block from the Baisely Park Gardens (which was near 121st Street), and classified by the federal government as projects. Additionally, the prosecution established that there were only two registered owners of white Lincoln Navigators within a five-block radius of those projects, one of whom was petitioner's mother.[12] In fact, the evidence showed, these two registered owners were the only ones within a five-block radius of either 121st Street or 121st Avenue and any projects in Queens County (Lorraine Wilson: 787; Cody Lok: 837). Accordingly, given the quality and quantity of this evidence, the admission of the victim's mostly repetitive statements to the police in the ambulance had no effect on the verdict much less one that was substantial and injurious.

---

[12] The other registered owner, Stephen Sheppard, lived at 120-35 145th Street, which was four blocks from Baisley Park Garden. He testified that he was the only one who drove his Navigator and that he knew no one named Tyrone (Sheppard: 776-778).

In short, the Appellate Division's rejection of petitioner's Confrontation Clause on the merits neither contravened nor misapplied *Crawford* and *Davis*. Certainly, reasonable jurists could disagree about whether the victim's statements were testimonial. As such, petitioner is not entitled to issuance of the writ on this basis.

Additionally, should the Court determine that Mr. Vann's statement in the ambulance or any of his other statements are testimonial in nature, none of them violate the Confrontation Clause because Mr. Vann's statements qualified as a dying declaration, which do not violate the Confrontation Clause even if they are testimonial.

For a statement to qualify as a dying declaration and an exception to the hearsay rule, the speaker must have been *in extremis* and also have spoken under a sense of impending death with no hope for recovery. *People v. Nieves*, 67 N.Y.2d 125, 131-32 (1986). As noted previously, the analysis in *Crawford* relies heavily on the right of confrontation as it existed "at common law, admitting only those exceptions established at the time of the founding." *Crawford v. Washington*, 541 U.S. at 54. In *Crawford*, Justice Scalia noted that the one pre-existing hearsay exception that indisputably existed at common law was the dying declaration. *Id*. at 56, n.6. Justice Scalia also

noted that, while many dying declarations may be testimonial, "there is authority for admitting even those that clearly are." *Id*. While the Court declined to decide whether dying declarations hold a special status under the Sixth Amendment, the Court acknowledged that dying declarations have a common law lineage, as evidenced by a wealth of common law cases and texts. *See King v. Reason*, 16 How. St. Tr. 1, 24-38 (K. B. 1722); *King v. Woodcock*, 1 Leach 500, 501-04, 168 Eng. Rptr. 352, 353-54 (1789); *State v. Moody*, 3 N. C. 31 (Super. L. & Eq. 1798); *United States* v. *Veitch*, 28 F. Cas. 367, 367-368, 1 Cranch C.C. 115, F. Cas. No. 16614 (No. 16,614) (CC DC 1803); *King v. Commonwealth*, 4 Va. 78, 80-81 (Gen. Ct. 1817); 1 D. Jardine, Criminal Trials 435 (1832) Cooley, Constitutional Limitations, at *318; 1G. Gilbert, Evidence 211 ©. Lofft ed. 1791); *see also* F. Heller, The Sixth Amendment 105 (1951) (asserting that this was the only recognized criminal hearsay exception at common law); *Giles v. California*, __ U.S. __, 128 S. Ct. 2678 (2008) (noting that Court had previously acknowledged that dying declarations were admitted at common law even though they were unconfronted, and calling it a "historic exception"). Thus, because the framers must have been aware of this well-established common law exception to the requirements of confrontation, and because the right of confrontation must be interpreted in light of the framers'

understanding, dying declarations should be admissible even if testimonial in nature.

Virtually every case to have considered the issue has held that dying declarations, even clearly testimonial ones, are admissible as an exception to the *Crawford* rule. These courts have reasoned that dying declarations were admissible at common law, and that under *Crawford's* historical analysis of the Sixth Amendment, the framers would have recognized dying declarations as outside the right of confrontation. *See, e.g., State v. Jones*, 287 Kan. 559, 569 (2008); *Commonwealth v. Nesbitt*, 452 Mass. 236, 250 (2008); *Harkins v. State*, 143 P.3d 706 (Nev. 2006); *State v. Martin*, 695 N.W.2d 578 (Minn. 2005); *People v. Ingram*, 382 Ill. App. 3d 997 (1ˢᵗ Dist. 2008); *People v. Paul*, 25 A.D.3d 165 (1ˢᵗ Dept. 2005) (finding statements made at scene non-testimonial and declining to decide whether dying declarations are "absolute" exception to *Crawford*; *People v. Durio*, 7 Misc. 3d 729 (Sup. Ct. Kings Co. 2005) (dying declarations were established common-law exception when the Confrontation Clause was framed).

Here, there is no question that Mr. Vann's statements constitute dying declarations. First, the evidence is clear that he was "in extremis." Mr. Vann was in serious distress having just been shot in the chest and was

bleeding profusely. He kept complaining to his mother that he was "burning up" (Puryear: 500). Further, William Masterson, the Emergency Medical Technician, testified that, as he was attending to Mr. Vann at the scene, Mr. Vann was choking on and spitting up blood and had difficulty breathing (Masterson: 565-567). Second, the evidence showed that Mr. Vann thought that he was going to die. As Ms. Colfeld, the home care attendant, was packing ice on his chest, Mr. Vann whispered that he was going to die (Colfeld: 1112). Further corroborating Mr. Vann's sense of his impending death, Officer Blandino told him in the ambulance that he had a big hole in his chest and that he "might not make it" (Blandino: 606). Under these circumstance, therefore, Mr. Vann's statements after he was shot constitutes dying declarations and properly admitted at trial regardless of whether they were testimonial in nature.

In short, not one of Mr. Vann's statements was testimonial in nature and, thus, were not barred from admission into evidence by *Crawford* and *Davis*. And even if they were, they were nonetheless admissible since they constituted dying declarations.

***

In sum, petitioner's Confrontation Clause claim is barred from review in this review in this Court by an independent and adequate state procedural ground. And because petitioner cannot show both cause for and prejudice from the procedural default and that he would suffer a miscarriage of justice, the Court should not overlook the default. In any event, petitioner also cannot show that the state court's alternative decision on the merits was either contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

## POINT THREE

**PETITIONER HAS FAILED TO ESTABLISH THAT THE STATE COURT CONTRAVENED OR UNREASONABLY APPLIED SUPREME COURT LAW IN REJECTING HIS CLAIMS OF INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL (Responding to Ground Three of the Petition).**

Petitioner contended in the state appellate court that he was denied the effective assistance of appellate counsel because counsel should have raised claims that trial counsel erroneously admitted a portion of a police report by Police Officer Robert Blandino that bolstered the officer's testimony concerning one of the victim's statements and that the trial court improperly failed to correct an inaccurate readback that the court had agreed to correct.

The Appellate Division, however, rejected this claim, concluding that petitioner had failed to establish that he was denied the effective assistance of appellate counsel. Petitioner now raises the same contention in this Court, but he has failed to show that the Appellate Division's decision to reject his ineffective-appellate-counsel claim was contrary to, or an unreasonable application of, clearly established Supreme Court law. He, therefore, is not entitled to the issuance of the writ on this basis.

As discussed extensively in Points One and Two, *supra*, petitioner cannot obtain relief for any claim adjudicated on the merits in state court unless he shows that the state court's adjudication of his claim was contrary to, or an unreasonable application of, clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

In this case, the Appellate Division decision, specifically concluding that petitioner had failed to sustain his burden of establishing that appellate counsel had been ineffective, constitutes an adjudication on the merits. *People v. Johnson*, 87 A.D.3d 1161 (2d Dept. 2011). The decision, therefore, is entitled to section 2254's deferential standard of review.

And applying the deferential standard to this claim, the state court decision cannot be said to have resulted in a decision that was contrary to, or

an involved an unreasonable application of, clearly established Supreme Court law. Here, the applicable Supreme Court law is the two-pronged standard established for reviewing a trial counsel's performance in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Evitts v. Lucy*, 469 U.S. 387 (1985). This test requires that a petitioner demonstrate first that counsel's performance fell below an objective standard of reasonableness, and then, that there is a "reasonable probability" that, but for counsel's error, the outcome would have been different. *Strickland v. Washington*, 466 U.S. at 688-94. As such, in attempting to demonstrate that appellate counsel's performance was deficient based on a failure to raise a claim, a petitioner must demonstrate more than the omission by appellate counsel of a non-frivolous argument; the petitioner must also show that, but for the failure to raise the argument, there is a reasonable probability that the outcome of the appellate process would have been different. *See Jameson v. Coughlin*, 22 F.3d 427, 429 (2d Cir.), *cert. denied*, 513 U.S. 888 (1994); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.), *cert. denied*, 513 U.S. 820 (1994); *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1993), *cert. denied*, 508 U.S. 912 (1993). Indeed, "[s]urmounting Strickland's high bar is never an easy task."*Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770 787 (2011), and a reviewing court "must indulge [the] strong presumption"

that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388 (2011). As the Second Circuit has noted, "The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).

Additionally, appellate counsel does not have a duty to raise every colorable claim on appeal, and, in fact, can use his or her reasonable discretion to determine which claims represent the petitioner's best opportunities for obtaining a reversal of a conviction. *See Jones v. Barnes*, 463 U.S. 745, 751-53 (1983). In *Jones*, the Supreme Court quoted various advocacy texts and discussed the risk of legal contentions "depreciating through overissue," noting that "multiplying assignments of error will dilute and weaken a good case and will not save a bad one." 463 U.S. at 753 (omitting citations).

There is, moreover, a strong presumption that an appellate counsel's decision not to raise other claims falls within a wide range of reasonable professional conduct. *Holmes v. Bartlett*, 810 F. Supp. 550, 561 (S.D.N.Y. 1993), quoting *Strickland v. Washington*, 466 U.S. at 689.

In this case, the Appellate Division decision neither contravened nor unreasonably applied these principles. First, the decision was not contrary to *Strickland*. Indeed, in rejecting petitioner's claim, the Appellate Division cited to *Jones v. Barnes*, *supra*, which holds that a petitioner does not have the right to have appellate counsel raise all non-frivolous claims on appeal, and that, rather, the decision as to which issues to raise is left in counsel's discretion. This is not contrary to the *Strickland* standard.

Second, the decision did not unreasonably apply *Strickland* as the facts show that petitioner failed in the state court to rebut the presumption that appellate counsel was effective. In this case, the brief composed by appellate counsel was well-organized, containing a C.P.L.R. § 5531 statement, a table of contents, a preliminary statement, questions presented, a factual summary of the trial, followed by a legal argument. Moreover, the brief submitted by appellate counsel was persuasive, competent, and wholly adequate in presenting petitioner's strongest claim to the Appellate Division.

Here, appellate counsel's brief reveals his complete familiarity with the record. Indeed, counsel, a highly experienced criminal attorney, followed through on his evaluation of the case, by submitting a sixty-three-page, well-researched and persuasively written brief advocating reversal of the

judgment of conviction. In this regard, relying on *Crawford v. Washington*, *supra*, counsel contended that the victim's dying statements to the police, his mother, and the mother's tenant identifying defendant as his assailant were testimonial and violated defendant's confrontation rights. Counsel's strategic decision to challenge the decedent's statements was wise because the victim's last words, made at a time when he knew he was dying and thus unlikely to fabricate, that identified defendant as one of the people who had shot him were powerful evidence of defendant's guilt. Moreover, the appellate court appeared to have concluded that there was merit to counsel's claim regarding the victim's later statements to the reporting police officer, although the court ultimately concluded that, to the extent the claim had merit, any error was harmless in light of the overwhelming evidence of petitioner's guilt.

Additionally, after the appellate court affirmed the judgment of conviction, counsel sought leave to appeal to the Court of Appeals. Counsel submitted a thirty-eight-page application, arguing not only that the *Crawford* issue was preserved for appellate review, but also that the appellate court wrongly concluded the claim was meritless and that any error was harmless. Significantly, as he stated in his letter, counsel filed the application on petitioner's behalf "out of an abundance of caution" even though petitioner had

not informed counsel whether he wanted to proceed pro se in the New York Court of Appeals, whether he wished to retain new counsel, or whether he wanted counsel to represent him. In short, appellate counsel acted as a single-minded advocate on petitioner's behalf.

As he did in state court, petitioner claims that counsel was ineffective because he failed to raise two issues that would have reversed his conviction. The proposed claims, however, would not have resulted in the reversal of the conviction, especially in light of the appellate court's conclusion that the evidence of petitioner's guilt was overwhelming. Therefore, appellate counsel exercised reasonable professional judgment by omitting them from his appellate brief, and petitioner cannot show that he was prejudiced as a result.

Petitioner claims, first, that appellate counsel should have raised a claim on appeal that the trial court erroneously admitted, on the prosecution's application, a portion of a police report prepared by Police Officer John Blandino memorializing one of the statements that the decedent had made to him on the way to the hospital. Petitioner apparently contends as he did in state court that the report constituted improperly bolstering and that the trial court's ruling that the defense had opened the door to its admission by

attacking the officer's testimony as a recent fabrication was wrong. Appellate counsel, however, exercised sound judgment in not raising such a contention because it plainly had no merit in light of the record that showed that defense did in fact challenge the officer's in-court testimony as a recent fabrication and that the lower court properly allowed the prosecutor to introduce the report that was made on the day of the murder.

In New York, the testimony of a witness may not be corroborated or bolstered by evidence of a prior consistent statement made before trial. *People v. McDaniel*, 81 N.Y.2d 10 (1993)*; People v. McClean*, 69 N.Y.2d 426, 428 (1987). If upon cross-examination, however, the testimony of that witness has been assailed, either directly or inferentially, as a recent fabrication, proof of the prior consistent statement made at the time when there was no motive to fabricate, may be introduced to rehabilitate that witness's credibility. *People v. McDaniel*, 81 N.Y.2d at 18. This exception to the hearsay rule is grounded in fairness; "it would be unjust to permit a party to suggest that a witness, as a result of interest, bias or influence, is fabricating a story without allowing the opponent to demonstrate that the witness had spoken similarly even before the alleged incentive to falsify arose." *Id*.

"Recent fabrication" means that the witness is charged "not with mistake or confusion, but with making up a false story well after the event." *People v. Davis*, 44 N.Y.2d 269, 277 (1978); Farrell, *Richardson on Evidence* § 6-503, p. 440 (11th ed. 1995)(citations omitted). In other words, the implication of recent fabrication arises only if it appears that the cross-examiner believes and wants the jury to believe that the witness is testifying falsely to "meet exigencies" of the case. *People v. Seit*, 86 N.Y.2d 92, 96 (1995).

As stated above, a cross-examiner does not have to explicitly accuse the witness of fabricating his or her testimony. Rather, if the cross-examiner implies or suggests through questions that the witness has recently fabricated the testimony, courts have consistently held that a prior consistent statement, made before the alleged motive to fabricate arose, is admissible. For example, in *People v. Seit*, 86 N.Y.2d 92 (1995), the Court of Appeals determined that the trial court should have allowed the introduction of a prior consistent statement when the prosecutor's questions to a defense witness implied that the testimony was recently fabricated. In a murder case where the defense was justification, the Court determined that although, on its face, the prosecutor's questions appeared to challenge the witness's testimony that he

and the defendant reasonably believed that the victim had had a gun, the line of questioning tended to establish that the witness in fact did not believe that the victim had had a gun and was fabricating his trial testimony. Of importance, the court noted, was that there was no suggestion that the witness's testimony was inaccurate because he was unable to see clearly or that he was confused by the excitement of the moment. Thus, the Court concluded, whatever the primary purpose of the question, the cross-examination created the inference that the witness's testimony was fabricated sometime after the incident to establish the defendant's justification defense. Accordingly, the Court decided that the trial court should have allowed into evidence a recording of the witness's 911 call that he had seen the victim with a gun. *Id.* at 96.

And in *People v. Boyd*, 58 N.Y.2d 1016 (1983), the Court of Appeals held that the prosecution was properly allowed to rehabilitate its witness, a police agent, after the defense's implicit assertions that she had fabricated her testimony. In that case, after the defense elicited testimony on cross-examination that the agent had omitted the defendant's name from her "buy reports" of October 31, and November 28, 1974, the Court concluded that counsel had implicitly assailed the agent's testimony as a recent fabrication.

The Court allowed the prosecution, therefore, to introduce into evidence the agent's "buy report," dated before she had completed the other buy reports, to rehabilitate her credibility.

So, too, here, the trial court properly allowed the state to introduce into evidence Officer Blandino's statement in a police report made on the day of the murder that the victim had told him about "Tyrone" frequenting his club after defense counsel implied to the jury that the officer had fabricated, since the last time he testified in this case, that the victim had ever made such a statement. Officer Blandino testified on direct examination that, as the victim lay in the ambulance, he said to the officer that "Tyrone did this to me," "he drives a white Navigator," and "he comes by my club from 121" (Blandino: 131-132). Officer Blandino also testified that, in the months before the murder, he was often in the area of the victim's club and in fact would drive by the club between ten to thirty times a night (Blandino: 135). During these times, the officer testified, he would often notice parked outside the club a white Lincoln Navigator (Blandino: 135).

On cross-examination, counsel sought to show that the officer not only made up the fact that he had seen the Navigator outside the club, but also that the victim had mentioned that "Tyrone" used to come to the victim's club.

In this regard, after eliciting that the officer did not make note of any other car parked outside the club, counsel asked him,

> Q. Now you've been interviewed by detectives several times on February 5, 2000.
>
> A. Yes, sir.
>
> Q. You testified before a Grand Jury, correct.
>
> A. Yes.
>
> Q. And at another proceedings before this Court, correct.
>
> A. Yes.
>
> Q. Would it be fair to say that no one ever asked you about seeing a white Lincoln Navigator at any other time; is that correct.
>
> A. Correct.
>
> Q. The first time that issue was brought up to you was in [the prosecutor's] office?

(Blandino: 147). The court sustained the objection, but counsel continued along those lines:

> Q. Well, you were preparing for trial with [the prosecutor], correct?
>
> A. Yes.

Q.  And you talked about questions that would be asked, right?

A.  Excuse Me.

Q.  You talked about questions that he would be asking you?

A. Yes.

Q.  And during one of those meetings he asked you
about a white Navigator; is that correct?

The officer eventually answered this question with, "Yes, sir" (Blandino: 148).

Counsel continued:

Q.  That was seen by the club on a regular basis?

A.  Yes.

Q.  Did he inform you that Tyrone Johnson drove a white Lincoln
Navigator?

A.  Well, I had known that that night.

Q.  So you knew that before you saw [the prosecutor]?

A. Yes.

(Blandino: 148).  Clearly, from these questions, counsel directly attacked the

witness's testimony about seeing a white Navigator outside the victim's club

as being fabricated after his conversations with the prosecutor.   After

establishing this before the jury, counsel then turned to the officer's testimony

about what the victim had said as he lay dying in the ambulance. Counsel asked Officer Blandino:

> Q. Now, do you recall testifying back on May 30th at a prior proceeding in this case and being asked this question and giving this answer.
> "QUESTION: While you were in the ambulance what, if anything, happened?
> ANSWER: I then asked him again what had happened. And he said, they tried to rob me. It was Tyrone. And at that occasion the ambulance workers wanted to render first aid to him, so I escorted the ambulance to the hospital. I'm sorry."
>
> Q. Did you then answer that question?
>
> A. Yes, sir.
>
> Q. Would it be fair to say that in part of that answer you didn't say anything about, he comes to my club, correct?
>
> A. That is correct.

(Blandino: 150). Counsel also asked Officer Blandino:

> Q. Now, you were asked this question page 1037
> "QUESTION: At what point did you stop speaking to him in the ambulance"
> "ANSWER: Right after I asked him again what had happened and he gave Tyrone from 121st, drives a white Lincoln Navigator. I let the technician render first aid to him."
>
> Q. Did you answer that question?

A. Yes.

Q.  Again no mention of, he comes to my club, right?

A.  That's correct.

Q.  And when you testified on May 30th you were testifying to the best of your ability; is that correct.

A. Yes, sir.

(Blandino: 150-51).  This part of the cross-examination elicited that the witness did not testify at the prior proceeding that the victim had said that the shooter would often come by his club.  Coupled with the series of questions that immediately preceded it concerning whether the trial prosecutor had told the witness what to say about the Lincoln Navigator being parked outside the club, the jury was left with the impression that the prosecutor had also influenced Officer Blandino's testimony about what the victim had said about the club.

Indeed, a fair inference to be drawn from counsel's questions to the officer about what the victim had told him about the shooter frequenting the club was that the officer had made it up since the last time that he testified in the case.  Counsel elicited twice during cross-examination that when the officer had previously testified about the victim's statement, although the

officer had mentioned that the victim had said that "Tyrone" shot him and that "Tyrone" drove a white Navigator, the officer had never mentioned that the victim had said anything about the shooter frequenting the victim's club. From this line of questioning, the jury could have reasonably inferred that counsel was trying to show that the officer had made up this testimony since the last time that he testified. And, accordingly, the trial court properly allowed the state to rehabilitate the officer's credibility with his complaint report written before he had any  meeting with the prosecutor.

Thus, given that the claim had no merit, appellate counsel reasonably chose not to raise a challenge to the trial court's ruling in this regard. Indeed, because the defense implied to the jury that the officer had recently fabricated a portion of his testimony, the trial court properly allowed the prosecutor to introduce into evidence the officer's prior consistent statement to rehabilitate his credibility.

Furthermore, even if the recent-fabrication claim was colorable, the likelihood of success on appeal was slim. As the appellate court found when it affirmed defendant's judgment of conviction, the evidence of his guilt was overwhelming. *See* Point Two, *supra*. Under these circumstances, there is no reasonable probability that the court's decision to allow the prosecutor to

introduce a prior statement of the police officer that the victim had told him that "Tyrone" frequented the victim's club had any impact on the verdict.

Similarly harmless is any error that stemmed from the court's failure to correct readback testimony, which is the second claim that petitioner claims that appellate counsel should have raised. During a readback of testimony, the court reporter read that Shanice Knight, a defense witness, had informed the police that she had "chronic amnesia" on the night of the murder while the officer had testified that Ms. Knight had said that she had "chronic insomnia." After defense counsel brought the matter to the court's attention, it promised to correct the testimony, but it never did. Petitioner claims that appellate counsel should have raised this issue on appeal.

But counsel could not have raised this issue because it is clear from the record that trial counsel had waived it. A waiver is the intentional relinquishment or abandonment of a known right. *Johnson v. Zerbst*, 304 U.S. 458, 464-465 (1938). Here, petitioner never alerted the trial court to the fact that it had failed to correct the testimony as it had promised to do. And by allowing the trial to end without seeking the corrective action that the court had promised, petitioner waived the right to complain about it. Thus, under these circumstances, appellate counsel wisely decided not to pursue a waived claim

on appeal.  *See People v. Alexander*, __ N.Y.3d __, 2012 N.Y. LEXIS 936 (May 3, 2012) (a properly interposed claim may be deemed abandoned or waived if not pursued).

Furthermore, as with petitioner's proposed improper bolstering claim, any error was harmless.  It is hard to imagine that, given the overwhelming evidence that pointed to petitioner's guilt, including the dying victim's statements to those who came to his aid that "Tyrone" had shot him, the jury's verdict rested on whether Ms. Knight, who was not an eyewitness to the crime, suffered from amnesia or insomnia.  It is even harder to imagine that the jury disregarded Ms. Knight's testimony because she had amnesia given that there was no cross-examination or summation comments referencing memory loss.  Accordingly, petitioner has failed to show that the outcome of his appeal would have been different had appellate counsel included a claim about the trial court's failure to correct the testimony.

In sum, petitioner has failed to show that the state court's decision to reject his claim that appellate counsel was ineffective was contrary to, or an unreasonable application of, *Strickland v. Washington*, *supra*.  Petitioner's complaints about counsel's conduct amounted to no more than a disagreement with counsel's strategic decision about what claims to raise on appeal and was

insufficient to show that counsel was ineffective.  Moreover, there was ample evidence that none of the claims that petitioner's proposes would have changed the outcome of his appeal.

## CONCLUSION

For the reasons set forth above, this Court should reject petitioner's application for a writ of habeas corpus.

Respectfully submitted,


RICHARD A. BROWN
District Attorney
Queens County

JOHN M. CASTELLANO
JOHNNETTE TRAILL
     Assistant District Attorney
       of Counsel

May 30, 2012