**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

**TYRONE JOHNSON,**

Petitioner,

-against-                                           11-CV-06270
                                                    (Vitaliano, D.J.)
**PHILIP D. HEATH,**

Respondent.

-----------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT
## OF PETITION FOR A WRIT OF HABEAS CORPUS

### PRELIMINARY STATEMENT

This Memorandum of Law is submitted in support of the petition for

writ of habeas corpus, seeking the immediate release of Petitioner, who is

currently in the custody of Superintendent Phillip D. Heath in violation of

the Constitution of the United States of America.

Petitioner is incarcerated pursuant to a judgment of the Supreme Court

of the State of New York, Queens County (Rios, J.) dated September 10,

2003 convicting him of murder in the second degree (felony murder),

attempted robbery in the first degree, criminal possession of a weapon in the

second degree and criminal possession of a weapon in the third degree and sentencing him to an aggregate prison term of twenty years to life.

Petitioner filed a timely notice of appeal and on October 6, 2009, the Second Department Appellate Division affirmed the judgment of conviction. *People v. Tyrone Johnson*, 66 A.D.3d 703 (2nd Dept. 2009)(Docket # 03-8551).   On February 17, 2010, the New York Court of Appeals (Read, J.) denied Petitioner's application for leave to appeal.  *People v. Tyrone Johnson*, 14 N.Y.3d 711 (2010).

After trial but before the direct appeal, petitioner filed a motion to vacate his conviction pursuant to N.Y.C.P.L. §440.10.  In that motion he alleged that he was denied due process of law and his right to be present at all critical stages when the trial court held two *ex parte* discussions with the trial prosecutor concerning substantive matters in the absence of  the petitioner and/or his counsel.  The motion was primarily based upon the affidavit of Judith Memblett court attorney for the trial judge, the Honorable James Rios.  After a hearing at which Judge Rios and the trial prosecutor testified, petitioner's motion was denied on October 26, 2006.  His application for leave to appeal to the Appellate Division was also denied.

On or about May 11, 2011 petitioner filed a petition for a writ of error *coram nobis* to the Appellate Division, Second Department alleging that he was denied effective assistance of appellate counsel when counsel failed to raise two meritorious issues. That petition was denied on November 4, 2011 and on December 9, 2011 the Court of Appeals denied his application for leave to appeal.

## STATEMENT OF FACTS

### Introduction

This case arises out of the shooting of Leroy Vann in the early morning hours of February 5, 2000. When shot, Vann was outside the single family Jamaica, Queens home that he shared with his mother, Mary Puryear. Vann managed to enter his house. He was attended to by his mother and her tenant, Brenda Colfield while police and an ambulance went to the scene. The first officer to arrive questioned Vann. He allegedly told him that "Tyrone" who drove a white Navigator had been one of the men that fired shots. Later at trial, Vann's mother and Colfield claimed that Vann had made similar statements to them. Vann died several hours after the shooting.

Petitioner Tyrone Johnson was questioned on the day of the incident but released. It was not until February 24, 2005 that he was arrested. By that time Henry Hanley, a neighbor of Vann's told the police that he observed petitioner shoot Vann from his porch across the street. Yet Hanley had been interviewed the day after the shooting and told police he had witnessed nothing. It was only after being arrested on a probation violation and being threatened with prosecution himself that he changed his story and implicated petitioner Johnson.

There were two trials in this case. The first ended with petitioner's conviction. However, that verdict was set aside with the District Attorney's consent, when it was learned that the initial trial prosecutor, Claude Stuart, had falsely told the court and counsel that he was not aware of the whereabouts of one Shanise Knight, who provided the police with an account of the shooting that exculpated Tyrone Johnson. The re-trial, conducted in July, 2003, again resulted in petitioner's conviction.

**Pre-Trial Ruling On Motion To Admit Statements**

On May 6, 2002, prior to the first trial, the prosecution moved, *in limine* for an order to admit declarations purportedly made by the decedent Leroy Vann to NYPD Officer John Blandino, the officer who first arrived at

the scene.  The petitioner objected arguing both that the declarations did not

fall within any hearsay exception and, in any event, their admission would

violate petitioner's rights under the "Sixth Amendment" in that they were

"uncross-examinable" statements and that there was no way to "confront"

the declarant (T. May 6, 2002, p. 23).  An evidentiary hearing was

conducted.  Two witnesses were called – the paramedic who responded to

the scene and the doctor who testified as to Vann's condition at the hospital

after he was removed from the ambulance.  <u>William Masterson</u>, the

paramedic testified that he observed Vann's gunshot wound after arriving at

the shooting scene.  Vann had difficulty breathing and appeared to be

choking on blood.  The court ruled that under these circumstances the

statements made at the scene and in the ambulance were admissible as

"excited utterances" notwithstanding their hearsay nature.  (Oral Decision,

T. May 7, 2002 at 2-3).

**The Trial**

     **The Prosecution's Case**

At about 3:20 A.M. on February 5, 2000, Leroy Vann, the owner of a

local after-hours spot known as the "Player's Club" was shot on the street in

front of his home located at 153-19, 112 Ave. in Jamaica Queens.   The

perpetrators fled the scene.   Although seriously injured, Vann managed to move into the entryway of his house.  His mother, <u>Mary Puryear</u> heard his cries for help  (Puryear: T.500).[1]  She testified that she observed her son holding onto the living room couch.  He allegedly stated "I've been shot, burning up inside.  Tyrone did it…Tyrone from the projects shot me." (T.500).  She summoned her tenant, <u>Brenda Colfield</u> who also worked as her health aide and also activated her "First Alert" button.  Ms. Colfield called 911 and was instructed to place ice on the wound (T. 1111).  She testified that she heard Vann state that "those niggers" tried to rob him.  She further claimed that she heard Vann state "repeatedly" that Tyrone shot him and that Tyrone drove a white Navigator and was from the projects near 121 St. (T.1112-11).  She admitted, however that in her first statement to the police she stated that she heard Vann state that the shooter drove a white "vehicle" and did not specify it as a Navigator (T.1113).

After the police and emergency services arrived, both Puryear and Colfield moved into the dining room.  Puryear testified that from that location she heard Vann tell police "Tyrone shot me.  He drives a Navigator… a white Navigator"  and "they robbed me"  (T.501, 503).

---

[1] "T" refers to the trial transcript.

Colfield testified that the police asked Vann about a handcuff on one of his wrists to which he responded "those niggers put it on him" (T. 1112).

Police Officer John Blandino was the first officer to arrive at the scene. He observed Ms. Puryear and Ms. Colfield in the doorway and Leroy Vann, lying on the ground at their feet (T.601). He asked Vann what happened and he replied, "they tried to rob me" (*Id*.). Blandino then asked Vann "Who?" and he allegedly replied "Ty…Ty drives a white Navigator…Ty from 121st". (T.602-603). Blandino testified that after Vann pointed to the north, Blandino asked "by the projects" to which Vann responded "Yes" (T.603). But on cross-examination, Blandino admitted that Vann never verbally replied but simply nodded (T.603, 627).

Blandino entered the ambulance and rode to the hospital with the EMS paramedic and Vann. He testified that he told Mr. Vann "Leroy, listen here, you have a big hole in your chest. There is a chance you might not make it. Let us catch this person... Tell me about Tyrone." (T. 605). According to Blandino, Vann replied "Tyrone did this to me. He drives a white Navigator. He comes to my club from 121st." (T.605-606). Blandino testified that he had seen a white Navigator parked on Sutphin Boulevard on half the time that the club was open. The vehicle was "very big" and "distinctive" (T. 609). On cross examination, Blandino admitted that he had

been interviewed several times by detectives after the incident and testified in the grand jury and at the first trial. In none of those instances did he state that he had seen a white Navigator in front of the club (T. 619-621). But knew that Petitioner did drive such a vehicle (T.622).

During cross-examination, counsel specifically addressed the statements allegedly made by Vann to Blandino inside the ambulance. Blandino reiterated that Vann told him he was shot by Petitioner, who drove a white Navigator, and who came to his club (T. 623). He was then asked if he testified differently at the first trial:

> Q. Now, do you recall testifying back on May 30th at a prior proceeding in this case [i.e. the first trial] and being ask (sic) this question and giving this answer:

> "Question: While in the ambulance, what if anything happened?

> "Answer: I then asked him again what had happened. It was Tyrone. And that that occasion the ambulance workers wanted to render first aid to him so I escorted the ambulance to the hospital. I'm sorry."

> Q. Did you then answer that question?

A.  Yes, sir.

Q.  Would it be fair to say that in part of that answer you didn't say anything about, he comes to my club, correct?

A.  That is correct.

…

Q.  Now were you asked this question, page 1037 [of the first trial].

"Question: At what point did you stop speaking to him in the ambulance?

"Answer:  Right after I asked him again what had happened and he gave me Tyrone from 121st, drives a white Lincoln Navigator.  I let the technician render first aid to him."

Q.  Did you answer that question?

A.  Yes.

Q. Again no mention of, he comes to my club, right?

A.  That's correct.

(T. 623-625).

On re-direct examination the prosecution sought to introduce a UF61 prepared by Blandino the day after the homicide.  In that UF61, Blandino reported that Vann stated that Tyrone frequented his club (T.641-642). Specifically the UF61 reported, "Victim states the above perp does drive a white Lincoln Navigator, and he frequently visits the victim's place of business."  (T.643).  The defense objected, noting that there had not been any claim of recent fabrication and that the questions were limited to pointing out an inconsistency (T. 643-644, 645).  The court sustained the objection with leave to renew (T.646-647, 649).

On the following day, the trial court reversed itself and ruled that the prosecution could introduce that portion of the UF61 wherein Blandino wrote that Vann stated that the perpetrator frequented his place of business. Counsel reiterated his objection.  He further added that his cross-examination was specific, i.e. whether Vann made the statement while speaking to Blandino inside the ambulance:

> MR. KOENING: My cross-examination was
> extremely specific and I directed him to prior

> testimony, given on direct examination about what was said in the ambulance. Very important to note that Blandino talked about two separate bodies of declarations. First in the home and then in the ambulance on the way to the hospital…

(T. 815). He further added that the UF61 is a "blanket statement. We don't know when it was stated." (T.819). The UF61 "is a summary, it's not a verbatim statement…it is not proper to bring this in to rehabilitate the witness, and there has been no issue of recent fabrication." (T.820). The court overruled the objection and permitted the prosecution to re-call Officer Blandino (T. 827-829).

The redacted UF61 admitted into evidence states that "Victim also states above perp does drive a white Lincoln Navigator and he frequently visits the victim's place of business" (T.1101). Blandino testified that he created the UF61 at 9:30 A.M. on February 5, 2000. He had last spoken with Leroy Vann six hours earlier at about 3:30 P.M. (T.1103).

Significantly, it was prior to the creation of that UF61, the police had already targeted Petitioner Johnson as the chief suspect. Police Officer Kenneth Robinson testified that he was directed to search for a white Lincoln Navigator (T. 671). At about 7:15 A.M. on February 5, he went to the area of the Baisley Park Gardens Projects at 121 Avenue and Sutphin

Boulevard.  He observed a white Navigator in front of a house located at

153-12 122 Avenue (T. 674-675).  At about 7:15 A.M. a man, later

identified as Petitioner, exited the house and entered the vehicle (T. 676-677,

680).   Robinson followed the vehicle around the corner.  Petitioner exited

and approached the officers.  He told Robinson that he had gotten a beep

from his friend who stated that the police thought he had shot Leroy.

Petitioner added: "I wouldn't shoot Leroy, he's a friend." (T. 680).

Petitioner agreed to accompany the officer to the precinct and was later

released.  He was not arrested until February 24, 2000 (Det. Charles

Morrison: 746).

Henry Hanley testified pursuant to a cooperation agreement.  On

February 5, 2000 he resided at 153-19 112 Ave., across the street from

Leroy Vann.  A few days after the Vann shooting, the police, conducting a

search for witnesses, came to his residence.  Hanley answered the door, told

the police to "hold on" and then fled out the back door (T. 864).  Then, on

March 16, 2000, Hanley was arrested for a probation violation and

questioned about pending cases (T. 864).  He ultimately gave numerous

statements about his purported knowledge of the Vann homicide.  In the first

two statements, he denied any involvement or even direct knowledge.  Then,

realizing that he might be charged with the murder, he made a statement

implicating petitioner Johnson and Shawn Williams in Vann's death (T. 883-884).[2]

By the time of trial, Hanley's account was the following. He testified that he knew Leroy Vann from his street and knew Tyrone Johnson from seeing him in Vann's club (T. 855-856). On the Friday before the homicide, he saw Mr. Johnson and another man in a white Navigator. Johnson allegedly asked Hanley if he would see Vann later on and Hanley replied affirmatively. He allegedly asked Hanley to call him when he did because he had something for him (T. 856-857). Mr. Johnson allegedly gave Hanley two fifty dollar bills along with his own cell phone number (T.857).

When Hanley got home, Vann was outside. He entered his own house and called Mr. Johnson's cell phone from the house phone (T. 859). The two men arrived in the Navigator but Vann had now gone (T.859-860). Hanley testified that the men gave him a walkie-talkie and instructed him to use it when Vann got home (T.860). At about 3:20 A.M., Hanley saw Vann and contacted the men. He then went outside, sat on his stoop, and smoked marijuana (T.848).

---

[2] Hanley was permitted to plead guilty to criminal facilitation and would receive no jail time and be restored to probation.

Hanley testified that he saw Mr. Johnson and Shawn Williams exit the Navigator and approach Vann who was across the street. Vann was standing on the sidewalk on the passenger side of his Jaguar with his back to Hanley. The two men were facing Hanley. The two men had guns and handcuffs. He heard Vann say that he was going to run his business as he saw fit and that they were "going to have to kill him…" (T.850-851). The men pushed Vann into the car. As Vann moved off of it "guns went off" (T. 852-853). After the shots Mr. Johnson and Mr. Williams fled in opposite directions.

Hanley testified that he went into the house and told his aunt, Shanise Knight to "call the cops because Leroy got shot" (T. 854). He then went downstairs into the basement. A short time later his aunt stomped on the floor. Hanley went upstairs where his aunt told him that Leroy had been shot, a fact Hanley had allegedly already known (T. 855).

After the first trial in this case, Hanley was visited at Green Haven Correctional Facility, where he was incarcerated for a robbery, by Investigator Michael Race (T. 873, 882). Hanley thought Race worked for the District Attorney's Office because he wore an NYPD investigator's ring. Accordingly to Hanley, at Race's request he signed an affidavit wherein he stated that he had not witnessed Vann's shooting (T. 879). He testified that the affidavit was not true (T. 880).

The prosecution presented evidence that as of February 5, 2000, fifty-seven people owned white Navigators in Queens County (T.787). One of them was Dorathea Johnson, petitioner's mother, whose address was listed as 153-15 122 Ave. in Jamaica (T.787).

**The Defense Case**

Shanise Knight testified that she resided at 153-18 112 Ave., across the street from Leroy Vann. On February 5, 2000 her niece Sharmaine Ramdass and her boyfriend Henry Hanley lived with her and resided in the basement apartment (T. 1191-92). At about 3:20 A.M. on February 5, 2000, Knight, who suffers from insomnia, heard what she thought was a gunshot. After making sure her children were safe and that Ramdass and Hanley were in the basement, she went to her living room and looked out the window (T.1194-95). She saw Vann coming from 112th and Sutphin. About ten minutes later she saw Vann on the steps leading up to his house and a man facing him. The man was as big as Vann and wore dark clothes. He was not Mr. Johnson (T.1196-97). Knight heard shots and then ran to the back of the house. She stomped on the floor, a signal she used to summon Hanley and Ramdass. It was only then that Hanley came upstairs (T.1198-99).

Knight did not call 911 and because of fear, did not talk to the police. A few days later the police came to her house. At that time she told them what she had seen. They showed her a picture of Tyrone Johnson, among others but she did not identify anyone (T.1202). Knight had never met Johnson and only first saw him when she attended court a year prior to the trial (T.1203).

Petitioner also presented an alibi defense. Sanders Jones testified that as of February 5, 2000 he resided with Johnson and his family at 153-15 122 Ave. in Queens. Jones had spent that entire day with Johnson (T.1232). In the evening, they first went to a friend's wake. They were then picked up by a friend who drove a Lexus. They ultimately went to a sports bar on Liberty Ave. and Van Wyck (T.1233). After they left the bar, they were driven to 121 and Sutphin where Mr. Johnson had parked his white Navigator. It was Jones who drove the Navigator back to Johnson's house as the latter was too drunk to drive (T.1234). They arrived at the house at about 1:30-1:45 A.M. and were admitted by Bradshaw Dewitt, who was Dorathea Johnson's fiancé. Petitioner went downstairs to his room and did not leave for the rest of the night (T. 1252).

**Jury Deliberations, Verdict And Sentencing**

The jury deliberated for nearly three days. On the last day, July 17, 2003, they asked for a read-back of Shanise Knight's testimony (T.1440). After the readback, defense counsel noted that the transcript contained an error that was read to the jury. On cross-examination of Ms. Knight, the prosecutor had read from a police report of their interview with her. The report as read stated that Knight told the police that she was awake because she suffers from "chronic <u>insomnia</u>" (T.1214). During the readback, however, the court reporter stated "chronic <u>amnesia</u>" (T.1445). All parties agreed that the readback was erroneous and that the mis-reading should be pointed out to the jury (1446-1448). The court indicated that it would do so after lunch (T. 1448).

After lunch there was a new note asking for the definition of the term "participant" in the felony murder count. That term was explained to the jury. There was no correction of the inaccuracy in the readback of Shanise Knight's testimony (T.1450-1460). After a brief recess, there was a new note stating that the jury had reached a verdict (T.1461). The jury acquitted Petitioner of depraved indifference murder but convicted him of felony murder, attempted robbery in the first degree, and criminal possession of a weapon in the second and third degrees (T.1462-1464).

On September 30, 2003, Petitioner was sentenced to twenty years to life for felony murder and lesser terms on the remaining counts, all to run concurrently.

On November 15, 2005, petitioner filed a motion to vacate his conviction pursuant to N.Y.C.P.L. §440.10. Attached to the motion was a letter from Judith Memblett, Judge Rios court attorney, to the State Commission on Judicial Misconduct. Among other matter addressed in the letter, Ms. Memblett informed the Commission that on December 12, 2002 (after the first trial but before the second), trial prosecutor Reibstein entered Judge Rios chambers without defense counsel. According to Memblett, the judge "analyzed the first trial, focusing on inconsistencies that he perceived in the evidence pertaining to various cars at the scene and opined that they were "problematic". A second ex parte conversation took place after conviction at the second trial, but before sentencing. During that conversation, Judge Rios told the prosecutor that the new conviction would likely be reversed due to misconduct during summation (See Memblett Letter attached to C.P.L. §440.10 motion).[3]

_____

[3] A complete explication of the facts concerning this claim is contained in Respondent's papers as well as the Memorandum of Law submitted by the defendant after the C.P.L. §440.10 hearing. Both are filed herein as part of the state court record.

On August 22, 2006, Justice Matthew D'Emic conducted a hearing on Mr. Johnson's claims. Ms. Memblett, Justice Rios and trial prosecutor Reibstein testified. On October 26, 2006, Judge D'Emic denied petitioner's motion to vacate. The court concluded, *inter alia* that the conversations did not constitute a material stage of the proceedings and that in any event the defendant was not prejudiced.[4] On January 22, 2007, the Appellate Division, Second Department, denied petitioner's application for leave to appeal the denial of the C.P.L. §440.10 motion.

**The Direct Appeal**

Petitioner filed a timely appeal to the Appellate Division, Second Department from the judgment of conviction. His brief essentially raised one issue: whether the admission of Leroy's Vann's statements to Mary Puryear, Brenda Colfield and the police violated his rights under the Sixth Amendment's Confrontation Clause as interpreted in *Crawford v. Washington*, 541 U.S. 36 (2004). On October 6, 2009, the Second Department affirmed. The Court held that the *Crawford* issue had not been preserved and, alternatively, that any error in admission of the statements was harmless. *People v. Johnson*, 66 A.D.3d 703 (2nd Dept. 2009). The

---

[4] Judge D'Emic's decision is part of the state court record filed by Respondent.

Court of Appeals denied Mr. Johnson's application for leave to appeal.

*People v. Johnson*, 14 N.Y.3d 771 (2010).

**The *Coram Nobis* Petition**

On or about May 11, 2011 petitioner filed a petition for a writ of error *coram nobis* to the Appellate Division, Second Department alleging that he was denied effective assistance of appellate counsel when counsel failed to raise two meritorious issues: 1) that Officer Blandino's testimony was improperly bolstered through admission of the UF 61 and 2) that petitioner was denied a fair trial when the court failed to correct the erroneous readback of Shanise Knight's testimony. That petition was denied on November 4, 2011 and on December 9, 2011 the Court of Appeals denied his application for leave to appeal.

# ARGUMENT

## POINT I

## THE STATE COURT UNREASONABLY APPLIED CLEARLY ESTABLISHED SUPREME COURT PRECEDENT WHEN IT CONCLUDED THAT PETITIONER'S CONFRONTATION CLAUSE RIGHTS WERE NOT VIOLATED.

### I. The Standard Under 28 U.S.C. 2254(d).

A state prisoner is entitled to a writ of habeas corpus under 28 U.S.C. 2254(d) on a claim that was adjudicated on the merits in state court if he shows that the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or

> (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. 2254(d).

Under the "contrary to" clause, the writ may be granted if the state court "confronts a set of facts that are materially indistinguishable from a decision

of [the Supreme] Court and nevertheless arrives at a different result from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court " 'correctly identifies the governing legal rule but applies it unreasonable to the facts of the particular prisoner's case' or refuses to extend a legal principle that the Supreme Court has clearly established to a new situation where it should govern." *Hoi Man Yung v. Walker*, 468 F.3d 169, 176 (2nd Cir. 2006) quoting *Williams v. Taylor*, 529 U.S. at 407-408. The "objectively unreasonable" standard requires a showing of something beyond error to warrant habeas relief. *Cotto v. Herbert*, 331 F.3d 217, 248 (2nd Cir. 2003). *See also Harrington v. Richter*, U.S. , 131 S.Ct. 770, 786 (2011)(noting that even a strong case for relief under federal law would not necessarily warrant issuance of the writ). However, *habeas* relief is not limited to decisions "so far off the mark as to suggest judicial incompetence". *Francis v. Stone* 221 F.3d 100, 111 (2nd Cir. 2000).

A state court's factual findings are presumed to be correct. 28 U.S.C. §2254 (e)(1). However, the presumption of correctness applies only to those factual findings that are reasonably discernable from the state court decision, *Boyette v. Lefevre*, 246 F.3d 76, 88-89 (2nd Cir. 2001). Moreover, where the

state court fails or refuses to make a factual finding on a relevant issue the factual deference required under 2254(e)(1) is inapplicable. *Ortega v. Duncan*, 333 F.3d 102, 106 (2nd Cir. 2003) citing *Channer v. Brooks*, 320 F.3d 188, 195 (2nd Cir. 2003). Notwithstanding the presumption of correctness, the factual determinations of the state court may be set aside if they are not fairly supported by the record. 28 U.S.C. § 2254(d)(2); *Galarza v. Keane*, 252 F.3d 630 (2nd Cir. 2001). Thus, factual deference

> [d]oes not imply abandonment or abdication of judicial review…A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude that the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence…[D]eference does not by definition preclude relief.

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## II. Petitioner Was Denied His Sixth Amendment Right To Confront Witnesses Against Him

### Admission Of Vann's Statements to Blandino Violated Clearly Established Supreme Court Precedent.

The Sixth Amendment to the United States Constitution provides, in part, "[i]n all criminal prosecutions, the accused shall enjoy the right…to be

confronted with the witnesses against him."   Many years ago, the United States Supreme Court held that

> [t]he primary object of [the Confrontation Clause] was to prevent depositions or *ex parte* affidavits…being used against the prisoner in lieu of a personal examination and cross examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury, in order that they may look at him, and judge by his demeanor upon the stand and manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States*, 156 U.S. 236, 242-243 (1895).  The right to cross-examine a witness in open court "is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  Indeed, "[t]he opportunity for cross examination, protected by the Confrontation Clause is critical to ensuring the integrity of the fact-finding process." *Kentucky v. Stincer,* 482 U.S. 730, 736 (1987).  *See also Maryland v. Craig*, 497 U.S. 836, 845 (1990)("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.").  Thus, there is a

strong presumption that any witness testifying be
subject to cross-examination and that out-of-court
statements should not be used against a criminal
defendant in lieu of in-court testimony subject to
the scrutiny of cross examination. As the Supreme
Court explained in *Pointer v. Texas*, 380 U.S. 400,
405 (1985), 'there are few subjects, perhaps, upon
which this Court and other courts have been more
nearly unanimous than in their expressions of
belief that the right of confrontation and cross-
examination is an essential and fundamental
requirement for the kind of fair trial which is this
country's constitutional goal.'"

*Cotto v. Herbert*, 331 F.3d 217, 229 (2nd Cir. 2003)(internal quotation marks

and citation included). Cross-examination is the "greatest legal engine ever

invented for the discovery of the truth." *California v. Green*, 399 U.S. 149,

158 (1970)(footnote and citation omitted).

In *Crawford v. Washington*, 541 U.S. 36 (2004) the United States

Supreme Court held that absent an opportunity to cross examine the

declarant, the Confrontation Clause bars admission of out-of-court

statements that are "testimonial", even where that statement falls within a

long-recognized hearsay exception. To pass constitutional muster, the

following is mandated: "where testimonial evidence is at issue … the Sixth

Amendment demands what the common law required: unavailability and

prior opportunity for cross-examination." 541 U.S. at 59.   While the

*Crawford* Court left "for another day any effort to spell out a comprehensive

definition of 'testimonial'", *Crawford v. Washington*, 541 U.S. at 68, it explicitly held that the term was not limited to formal statements produced in response to a subpoena. "Statements taken by police officers in the course of investigations", said the Court, "are also testimonial even under a narrow standard." *Id*. at 52. Such statements "bear a striking resemblance to examinations by justices of the peace in England. The statements are not *sworn* testimony, but the absence of an oath was not dispositive." *Id.* The open "[i]nvolvement of government officers in the production of testimony with an eye toward trial" renders out of court statements testimonial. *Crawford v. Washington*, 541 U.S. at 56, n.7; *see also Lilly v. Virginia*, 527 U.S. 116, 137 (1999)(plurality opinion)("when the government is involved in the statements' production and when the statements describe past events," the statements "implicate the core concerns of the old *ex parte* affidavit practice").

In *Davis v. Washington*, 547 U.S. 813 (2006), the Court considered two consolidated cases to "determine more precisely which police interrogations produce testimony." In the first case, *Davis*, the trial court admitted into evidence recordings of statements the non-testifying complaint made to a 911 dispatcher about the defendant's assault, which occurred moments before the call, but fled while the victim continued to be

questioned.  In the second case, *Hammon v. Indiana*, 547 U.S. 820 (2006), the trial court admitted into evidence police officer testimony of statements the non-testifying complainant made to the police during their investigation.

The Court reiterated the holding of *Crawford*, i.e. that testimonial hearsay is generally inadmissible under the Confrontation Clause, and offered a formulation of which statements qualify as such.        The *Davis* Court reiterated that the thrust of the relevant *Crawford* inquiry is not whether the statements were a product of "formal" interrogation, 547 U.S. at 826 but whether the statements were elicited in response to  investigatory questioning by law enforcement.  Moreover, statements are testimonial when "circumstances objectively indicated that there is no…ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to a later criminal prosecution."  *Davis v. Washington*,  547 U.S. at 822.  Under this clearly established standard it is clear that the primary purpose of Officer Blandino's interrogation of Leroy Vann was to solve the case and not to deal with an on-going emergency.

Officer Blandino testified that when he arrived at Leroy Vann's residence on February 5, 2000, Vann was laying between the stoop and the doorway to the house.  He was being attended to by Mary Puryear and Brenda Colfield.  Neither Puryear nor Colfield expressed any fear for their

own safety or that they were otherwise in any danger. Blandino walked passed Puryear and Colfield and went into the house thereby insuring that the shooter was not inside and no one's safety was jeopardized: As he testified:

> I ***walked by*** the two females to look in the house to make sure our safety wasn't jeopardized and somebody wasn't in the house, and ***stepped back outside*** again and asked what happened.

(T. 601)(emphasis added).

Thus, Blandino's first question to Vann, "what happened?" was an investigative one (T. 601). He had already learned that the shooter was not in the vicinity. His question was therefore designed to learn the circumstances of the shooting and the identity of the perpetrator for possible prosecution. After Blandino asked "what happened", Vann allegedly replied:

> they tried to rob me. … [Vann] said, Ty, Ty, did this to me. … He tells me Ty drives a white Navigator. … he also stated Ty, Ty, from 121st. … he pointed north-bound and I said, by the projects? He said, yes. … Tyrone from 121st.

(T. 601-604).

Officer Blandino's next round of questioning was even more investigative and Vann's responses indisputably testimonial. Blandino

insensitively told Vann while the latter was lying in the ambulance, "Leroy listen here, <u>you have a big hole in your chest</u>.  <u>There is a chance you might not make it</u>, but let us catch this person that did this to you.  Tell me about Tyrone." (T. 605) (emphasis added).  It was then that Vann allegedly named "Ty", that he drove a white Navigator and that he frequented his club.

The statements were testimonial because Officer Blandino was not acting to intervene in an ongoing emergency, but rather to locate and identify the perpetrator of "possibly criminal past conduct." *Davis/Hammon*, supra, 547 U.S. at 829.  See also  *Crawford v. Washington* 541 U.S. at 56 n. 7 ("[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse.") and  *Lily v. Virginia*, 527 U.S. 116, 137 (1999)("when the government is involved in the statements' production, and when the statements describe past event," [as was the case here] they "implicate the core concerns of the old *ex parte* affidavit practice).   Vann was "describing [a] past even[]" and not describing "events as they were actually happening." *Davis*, *supra*. 547 U.S. at 830.  Indeed, Vann's statements were unquestionably accusatory in nature, identifying the perpetrator of the "past criminal event."   Vann's alleged statements to Blandino were testimonial even under a narrow

standard and their admission violated petitioner's rights under the Confrontation Clause.

## III.   The Error Is Not Harmless

The Appellate Division held that even if the statements to Blandino were wrongfully admitted, such admission was harmless.  In this 28 U.S.C. §2254 proceeding, petitioner is entitled to the writ if it is shown that the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Wood v. Ercole*, 644 F.3d 83, 93-94 (2nd Cir. 2011), citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).   That standard is easily satisfied.

Vann's alleged statements to Blandino were powerfully incriminating in and of themselves.  He allegedly stated that "Tyrone" from "121 by the projects" who drove a white Navigator and frequented his club had committed the shooting.  Through other witnesses, the prosecution was able to show that petitioner resided near, but not in, those projects and that his mother, with whom he lived, had a white Navigator registered to her.  The statements  provided critical corroboration to the evidence elicited from Mary Puryear, Brenda Colfield and Blandino himself.    Puryear and Colfield claimed to have heard Vann say that "Tyrone from the projects" did

the shooting (T. 500, 1126). But both heard those alleged statements under extremely stressful circumstances, tending to Vann as he lay dying inside the house. And on cross examination, Colfield admitted that when she first spoke to the police she said nothing about a Navigator (T. 1124). Blandino self-servingly claimed that he regularly saw a white Navigator outside the club. Vann's purported statements therefore served to corroborate his otherwise unsupported claim that a white Navigator was regularly present outside Vann's club.

Respondent argues that the Appellate Division's finding of harmless error is supportable by stressing the testimony of purported eyewitness Henry Hanley. However, Hanley's credibility and reliability were seriously undermined. When first questioned by the police, Hanley stated that he did not view the incident at all (T. 862). It was only after being threatened with a probation violation and then prosecution as an accessory to the Vann homicide that he changed his story and implicated Tyrone Johnson (T. 863-867, 874, 884-885). He testified at trial pursuant to a cooperation agreement whereby he was permitted to plead guilty to a misdemeanor, thirty days on jail and restoration of his probation (T. 869-870). Then, after the first trial, Hanley executed an affidavit wherein he stated that he did not witness the shooting (T. 901). Moreover, Sharmaine Ramdass and Shanise

Knight, with whom Hanley lived, testified that Hanley was in the basement at the time of the shooting and could have viewed nothing. Significantly, neither witness knew petitioner Johnson and neither had a motive to testify favorably for him. (Ramdass: Tr. 1172, 1187; Knight: Tr. 1194-1199). Knight, who actually observed the entire incident and who was interviewed by the police provided them with a description of the shooter than was vastly different from Tyrone Johnson's (T. 1197).[5] Hanley's testimony, when considered in light of his ever-changing accounts, his motive to curry the prosecution's favor and the exculpatory accounts provided by Knight and Ramdass, cannot provide the basis for a finding that the evidence against petitioner was strong, let alone overwhelming. Accordingly, the admission of Vann's purported statements to Blandino that were elicited in violation of the Confrontation Clause "had a substantial and injurious effect or influence" on the jury's verdict and warrants issuance of the writ.

## IV. The Claim Is Not Procedurally Barred

Respondent avers that the Confrontation Clause issue is not cognizable on habeas review because the state court rejected the claim under adequate and independent state court procedural grounds. For the following

---

[5] According to Knight, the shooter was "much bigger" that the defendant in court, Tyrone Johnson (Tr. 1197).

reasons, this case falls within the narrow line of cases where the federal constitutional claim is not procedurally barred notwithstanding the state court's clearly stated rejection of it on state procedural grounds.

Under the "independent and adequate state grounds" doctrine a federal *habeas* court will generally not consider a question of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). A state procedural rule such as New York's contemporaneous objection rule constitutes such an independent state ground. However, "the question of when and how defaults in compliance with state procedural rules can preclude…consideration of a federal question is itself a federal question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2nd Cir. 1999) quoting *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). In *Lee v. Kemna*, 534 U.S. 362 (2002) the United States Supreme Court recognized that while

> [o]rdinarily, a violation of 'firmly established and regularly followed' state rules…will be adequate to foreclose review of a federal claim," [there are] exceptional cases where exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question.

534 U.S. at 376. Thus, "state courts may not avoid deciding federal issues by invoking procedural rules that they do not apply even-handedly to all similar claims." *Garcia v. Lewis*, 188 F.3d 71, 77 (2nd Cir. 1999) quoting *Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982). Because there is a presumption against finding a state procedural bar, *Galarza v. Keane*, 252 F.3d at 637, the appropriate inquiry is whether

> application of the procedural rule is "firmly established and regularly followed" in the specific circumstances presented in the case, an inquiry that includes an evaluation of the asserted state interest in applying the procedural rule in such circumstances.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2nd Cir. 2003) citing *Lee v. Kemna*, 534 U.S. at 386-387. The issue here, therefore, is whether New York courts have applied the contemporaneous objection rule to bar review of a Confrontation Clause claim where the defendant has argued that admission of the declarations would violate the "Sixth Amendment", the right to cross-examination and the ability of the defendant to "confront" the witness.

*Cotto v. Herbert*, 331 F.3d at 240 (noting that "most importantly", the adequacy of the state procedural rule must be determined with reference to the "particular application" of the rule to the case at hand).

Prior to the first trial, the prosecution moved *in limine* for admission of Vann's statements to Blandino. A colloquy on that motion took place on May 6, 2002. When asked to state his position on the motion, trial counsel stated that his objection went beyond the rule against hearsay but to the "Sixth Amendment", his right to cross-examine and his ability to "confront" the declarant:

> Because attending to all of this, of course, is this inherent Sixth Amendment concern that [the New York Court of Appeals case] *Nieves* keeps coming back to, that these are uncross-examinable statements so the prejudice – by virtue of their admissibility in, by virtue that there is no way to confront the utterer or declarant of those words.

(Tr. May 6, 2002, p. 23).

"In analyzing the adequacy of the claimed procedural bar, we look to the statute and case law interpreting New York's statutory preservation rule in criminal proceedings". *Cotto v. Herbert*, 331 F.3d at 243 citing *Lee v. Kemna*, *supra*., 534 U.S. at 382. That petitioner's argument, quoted *supra*., was sufficient to satisfy New York's contemporaneous objection rule is illustrated by the New York Court of Appeals' 2005 decision in *People v. Hardy*, 4 N.Y.3d 192 (2005). The *Hardy* trial, like the instant trial, took place prior to the Supreme Court's decision in *Crawford*. In it, the prosecution moved for admission of a non-testifying co-defendant's plea

allocution.  Hardy objected on "Sixth Amendment" grounds.  He did not use
the term "testimonial".   On appeal to the Court of Appeals, the prosecution
argued that the objection was not specific enough to preserve the issue in
that court.  Rejecting that argument in a footnote, the Court of Appeals
stated

> Despite the Peoples' assertion, the record makes
> clear that defense counsel made a timely and
> specific objection to the People's use of the plea
> allocution.  Counsel objected, and claimed that the
> use of  Janiero's plea allocution, without being
> subject to cross examination violated defendant's
> Sixth Amendment rights.  The specific and timely
> objection preserved the issue for our review.

*People v. Hardy*, 4 N.Y.3d at  199, n.3.  Likewise, trial counsel's objection
herein that referenced both the Sixth Amendment and the right to cross
examination equally preserved the issue for review for petitioner Johnson.
Indeed, his objection went even further since he argued that the statements'
admission would deny him the ability to "confront" the declarant.

To avail itself of a procedural bar defense, a state court must treat
similar claims evenhandedly.  *Hawthorn v. Lovorn*, 457 U.S. at 263.   That
did not happen here.  The defendant in *People v. Hardy* was found to have
preserved his Confrontation Clause claim when he used the term "Sixth
Amendment" and the denial of cross examination.  Petitioner Johnson used

the exact same terms but was held by the Appellate Division not to have preserved that claim. Accordingly, the claimed procedural bar is, in this case, inadequate to preclude *habeas* review of the Confrontation Clause claim.

## POINT II

### PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

### I. The Standard For Ineffective Assistance Of Counsel.[6]

The right of an accused to the effective assistance of counsel is guaranteed by the Sixth Amendment to the Constitution of the United States. Under the federal Constitution, a defendant is entitled to a new trial if he satisfies a two-prong test. First, he must show that his attorney's performance "fell below an objective standard of reasonableness". *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Second, it must be demonstrated that there is a "reasonable probability that but for counsel error, the outcome would have been different." *Id*. at 694. The *Strickland* standard applies to claims of ineffective assistance of appellate counsel.

---

[6] The AEDPA standard set forth in Point I also applies to the claims set forth in this Point as well and Point III.

*Smith v. Robbins*, 528 U.S. 259 (2000); *Mayo v. Henderson*, 13 F.3d 528, 533 (2nd Cir. 1994).

Mr. Johnson was denied effective assistance of appellate counsel when his attorney failed to raise two meritorious issues based in New York State law. *Claudio v. Scully*, 989 F.2d 798 (2nd Cir. 1992)(appellate counsel ineffective for failing to raise claims arising under state law).

## II. Improper Bolstering

Under New York law it is well settled that a witness' trial testimony may not be bolstered with pre-trial statements. *People v. McDaniel*, 81 N.Y.2d 10, 11 (1993); *People v. McLean*, 69 N.Y.2d 426 (1987); *People v. Davis*, 44 N.Y.2d 269 (1978). *See also People v. Trowbridge*, 305 N.Y. 471. As the New York Court of Appeals noted in *People v. McDaniel*, 81 N.Y.2d at 16,

> [s]everal rationales underlie the rule: untrustworthy testimony does not become less so merely by repetition; testimony under oath is preferable to extrajudicial statements; and litigations should not devolve into contests as to which party could obtain the latest version of the witness' story.

(citations omitted). The admission of Police Officer Blandino's UF 61 violated that rule. On direct examination, Blandino testified that while questioning Vann in the ambulance, the latter told him that the shooter was a

38

regular customer at his after hours spot, The Player's Club.  In the report, Blandino wrote that Leroy Vann told him that the shooter "frequented his place of business."  That reference improperly bolstered Blandino's trial testimony.

Contrary to the trial court's determination, the UF 61 was not admissible as a prior consistent statement.   On cross-examination, defense counsel's pointed out that when testifying at the first trial about his interview with Vann in the ambulance, Blandino never mentioned anything about the shooter frequenting the club.  The lower court ruled that through this questioning counsel inferred that Blandino's trial account about the club was a recent fabrication and, accordingly, rehabilitation through the UF 61 was proper.   For two reasons, the lower court was wrong.

First, counsel's questions to Blandino were specific and only related to what was said or not said in the ambulance:

> Q.  Now, do you recall testifying back on May 30th at a prior proceeding in this case [i.e. the first trial] and being ask (sic) this question and giving this answer:
>
>
> "Question:  While in the ambulance, what if anything happened?

"Answer: I then asked him again what had happened. It was Tyrone. And that that occasion the ambulance workers wanted to render first aid to him so I escorted the ambulance to the hospital. I'm sorry."

Q. Did you then answer that question?

A. Yes, sir.

Q. Would it be fair to say that in part of that answer you didn't say anything about, he comes to my club, correct?

A. That is correct.

(T.623-624). Petitioner was simply pointing out an omission in terms of what was said in the ambulance. He was not inferring that Blandino's entire account was fabricated. The UF61 purported to summarize everything that Vann alleged said. Its contents were not limited to what was said in the ambulance. It simply bolstered Blandino's testimony and therefore it was not admissible. *People v. Thomas*, 68 A.D.3d 1141, 1142 (2nd Dept. 2010)(error to admit prior consistent statement where no inference of recent fabrication); *People v. Smith*, 136 A.D.2d 935 (4th Dept. 1988)(pointing out inconsistency is not equivalent of inferring recent fabrication).

Second, and more fundamentally, even where there is a claim of fabrication, to be admissible a prior consistent statement must have been made at a time when there was no motive to falsify. *People v. Davis*, 44 N.Y.2d at 277. By the time the UF 61 was written, the police had already targeted petitioner Johnson as a suspect. At 7:15 A.M., on February 5, the police confronted petitioner Johnson outside his house on 122 Avenue. (T.677-680). Petitioner Johnson told the police that he had heard that Leroy Vann was shot and that the police thought he was involved. He then agreed to accompany them to the police station for further questioning (687). Petitioner was not arrested, but was released. The case Detective Morrison emphasized that he was released not because he was not a suspect but because release would somehow aid the search for the second perpetrator (T. 746-748). Blandino's UF 61 was not written until 9:30 A.M., hours after petitioner had been named as a suspect and over two hours after he had been initially questioned by the police (T. 1096). Moreover, Blandino himself was interviewed by Detectives before drafting the UF61 and likely was informed (if he had not learned earlier) that the investigation was now focused on Tyrone Johnson (T. 1104). Thus, Blandino wrote the UF61 when the police had a motive to further implicate Mr. Johnson in the shooting. It was not, therefore, admissible for purposes of rehabilitation.

*People v. McLean*, 69 N.Y.2d at 428 ("If the same motive to falsify which exists at the time of the testimony existed at the time the prior consistent statement was made, the statement remains inadmissible."); *People v. Deutsch*, 235 A.D.2d 330 (1st Dept. 1997)(proponent must establish that prior consistent statement pre-dated motive to falsify); *People v. Spears*, 194 A.D.2d 636 (2nd Dept. 1993)(reversible error to admit prior consistent statement where defense claimed that case was trumped up from the beginning); *People v. Simon*, 96 A.D.2d 1086 (2nd Dept. 1983)(error to admit accomplice's plea minutes where defense argued that he fabricated story to get a beneficial plea bargain). <u>See also</u> *People v. Marcial*, 178 A.D.2d 493 (2nd Dept. 1991); *People v. Siply*, 209 A.D.2d 864 (3rd Dept. 1994); *People v. Ray*, 132 A.D.2d 713 (2nd Dept. 1987). It is for this reason that the trial court's reliance of *People v. Boyd*, 58 N.Y.2d 1016 (1983) was misplaced. In <u>Boyd</u> there was no proof that the prior statement was made after the motive to fabricate arose. In this case, the undisputed evidence was that it was made when there was, in fact, a motive to falsify.

Further error was committed when the UF61 was admitted without a limiting instruction. It was well established at the time or Mr. Johnson's trial that a prior consistent statement, even if deemed admissible, may not be considered for its truth. <u>See</u> *e.g. People v. Williams*, 139 A.D.2d 683 (2nd

Dept. 1988).   It may only be considered as bearing upon the witness's credibility, i.e. to rebut a claim of recent fabrication.  *Prince, Richardson On Evidence* §6-503.   Here, the UF61 was admitted without qualification and was likely used by the jury for the truth of the matter asserted, namely that the shooter was Tyrone who frequented Leroy Vann's club.

Admission of the UF61 was not harmless. The most crucial issue for the jury to determine was whether Leroy Vann made the subject statements and/or whether the witnesses heard them accurately.  That Blandino wrote the UF61 within a day of the shooting undoubtedly influenced that determination.   Moreover, it was also Blandino who testified that he observed the white Lincoln Navigator parked near the club half of the time that it was open (T. 609).  Henry Hanley, the only other witness linking petitioner to the shooting, received benefits for his cooperation, was effectively impeached and recanted his trial account in a sworn affidavit. Thus, it is unlikely that the Appellate Division would have ruled the error harmless had it been raised on direct appeal.

## III.  Inaccurate And Prejudicial Readback

Under New York law a trial court must respond meaningfully to a jury's request for a readback of testimony or for further instructions on the law.  *People v. Malloy*, 55 N.Y.2d 296 (1982).  Failure to answer or to

answer incorrectly is reversible error if there is prejudice to the defendant. *People v. Kisoon*, 8 N.Y.3d 129, 134 (2007); *People v. Jackson*, 20 N.Y.2d 440 (1967); *People v. Smith*, 68 A.D.2d 1021, 1022 (2nd Dept. 2009).

On July 17, 2003, the jury's second full day of deliberations, it requested, *inter alia*, a readback of the testimony of defense witness Shanise Knight, whom they referred to as "Henry Hanley's aunt" (1444). After the reading of that testimony, defense counsel pointed out an error. During the prosecutor's cross-examination of Ms. Knight, he read from a DD5 of an interview with her. According to the DD5, Ms. Knight told the police she had "***chronic insomnia***". However, in the readback, the court reporter read "***chronic amnesia***" (1445)(emphasis added). The court agreed to make the correction after the jurors completed their lunch (1447).

However, that correction was never made. After lunch, the jurors submitted a new note asking for clarification on a legal issue (1448). Shortly after the court complied with the request, the jury submitted a note stating that they had reached its verdict (1461).

The trial court's failure to correct the readback to accurately reflect Ms. Knight's testimony prejudiced Mr. Johnson. Ms. Knight was a crucial defense witness. She testified that Henry Hanley was in the basement sleeping when the fatal shots were fired thereby refuting the only eyewitness

who placed petitioner Johnson at the scene (T. 1198-1200). Moreover she testified that the one man speaking with Leroy Vann was vastly different in appearance from petitioner Johnson (T. 1195-97). Through his cross-examination, the prosecutor attempted to infer that Ms. Knight saw nothing or was confused (T. 1211-1214, 1223). That the jury requested her testimony late in the deliberations could only mean that they were grappling with whether her account of that night was believable. But during the readback they were told that in her first statement to the police, she stated that she suffered from a memory disorder, i.e. amnesia. This improper (and uncorrected) readback is what may have tipped this close case in the prosecution's favor and therefore was reversible error.

In *People v. Smith supra*., the Appellate Division, Second Department reversed a conviction where the trial court determined, erroneously, that only one of two police officers had testified about the subject matter requested in the jury's note. That failure "seriously prejudiced" the defendant. *People v. Smith*, 68 A.D.2d at 1022. Likewise, in *People v. Aikens*, 119 Misc.2d 1085 (Kings Co. 1983), a conviction was set aside where the court reporter, during a readback, used the word "feet" instead of "teeth" when reading testimony about the defendant's appearance. Because the defendant's missing teeth was a key issue, the verdict was set aside.

The facts of this case exceed those of *Smith* and *Aikens*. Shanise Knight gave an account that totally exculpated petitioner Johnson. Yet the jury was led to believe that she admitted to suffering from "chronic amnesia." Indeed, in summation, the prosecutor told the jury that Ms. Knight was a witness who "can't keep her story straight" (T. 1351). Under these circumstances, the prejudice to Mr. Johnson was enormous.

Both of the foregoing issues were meritorious and counsel was ineffective for failing to raise them on direct appeal. Appellate counsel's ineffectiveness herein is further demonstrated by the fact that the issue he did raise, because of preservation issues, was far weaker than the ones he did not. *Mayo v. Henderson*, 13 F.3d at 533; The Second Department determined, albeit erroneously, that the Confrontation issue was not properly preserved.[7] Conversely, the bolstering and readback claims were unquestionably properly preserved by timely, specific objections.

Moreover, both issues would only have enhanced the Confrontation Clause claim as they would have further illustrated the weaknesses in the prosecution's overall case. Thus, this is not a case where appellate counsel's failure to raise an additional issue can be deemed strategic. *Jones v. Barnes*, 463 U.S. 745 (1983). This Court should grant the writ of habeas

---

[7] The court did, alternatively, reject the claim on the merits.

corpus and issue an order granting petitioner Johnson's immediate release or, alternatively, a new trial.

## POINT III

### PETITIONER WAS DENIED DUE PROCESS OF LAW AND WAS DENIED HIS RIGHT TO BE PRESENT WHEN THE TRIAL JUDGE HELD TWO EX PARTE CONFERENCES WITH THE TRIAL PROSECUTOR

A former court clerk, in a written complaint against the trial court, revealed, in relevant part, that between the first and second trials of this matter, the trial judge held an *ex parte* meeting in chambers with the trial prosecutor. During the meeting substantive matters regarding the evidence presented at the first trial and expected evidence at the second trial were discussed. Neither the petitioner nor his attorney was present. Then, after the jury verdict but before sentencing, the trial judge held a second *ex parte* meeting with the prosecutor where substantive matters were discussed.

These unusual and highly inappropriate *ex parte* communications were, in effect, "secret meetings" designed to give the prosecutor the upper hand during petitioner Johnson's second trial. Tellingly, the trial judge's former court attorney, Judith Memblett, revealed these secret meetings. She

47

wrote to the State Commission on Judicial Misconduct that, during the first private meeting the trial judge "analyzed the first trial, focusing on inconsistencies that he perceived in the evidence pertaining to various cars at the scene," and that "these inconsistencies were problematic to the prosecution's case." Ms. Memblatt also wrote that, during the second *ex parte* meeting, the trial judge told the prosecutor that petitioner Johnson's "conviction would have to be reversed on appeal due to the improprieties in [the prosecutor's] summation" and that he improperly vouched for his witnesses.

After the petitioner filed a C.P.L. §440.10 motion to vacate judgment, a hearing was conducted and Judge Rios testified. He stated he had no recollection of what was discussed other than stating that he may have "thrown a one liner" to the prosecutor. It is noteworthy the trial judge did not categorically deny the truth of the allegations put forth by Ms. Memblatt. The trial judge had no recollection of discussing the specifics of the case; but the prosecutor essentially did (Hearing: 108, 112-13, 124).[8]

_____

[8] Significantly, as conceded by respondent, the prosecutor testified at the hearing and essentially corroborated Ms. Memblatt in critical areas, to wit that there was a discussion about the weaknesses in the Peoples' case. (Hearing: 148-49, 151-152, 157, 162).

On October 26, 2006, the petitioner's motion to vacate was denied *in toto*. The hearing court held the prosecutor, ADA Reibstein, gave credible testimony at the hearing and that because the *ex parte* conversations transpired six months before the second trial was to commence, petitioner Johnson was not prejudiced. (Court's Decision: 6-7, 10) And while the hearing court acknowledged the conversations entered "improper territory" it nonetheless found that the petitioner's right to counsel was not contravened since counsel's presence was not required. (Court's Decision: 10-11).

The motion court additionally held, in an argument repeated by respondent herein, that even assuming there were substantive conversation concerning the case, no cognizable right was violated. According to respondent, the Constitution would not be implicated if, as shown here, a judge engaged in ex parte strategy sessions with counsel for a party in the absence of the adversary. For the following reasons, the state court's conclusion was objectively unreasonable and respondent's argument seriously flawed.

It is a basic requirement of the Due Process Clause of the Fourteenth Amendment that a defendant be given a "fair trial in a fair tribunal." *In re Murchison*, 349 U.S. 133, 136 (1955). Accordingly, "the orderly conduct of

a trial by jury essential to the protection of the right to be heard, entitled the parties who attend for the purpose to be present in person or by counsel at all proceedings from the time the jury is empanelled until the time it is discharged after rendering the verdict." *Rogers v. United States*, 422 U.S. 35, 38 (1975). *See also Snyder v. Massachusetts*, 221 U.S. 97, 105, 106 (1934) (criminal defendant has right to be present at all critical stages of the proceedings). Thus, due process, and, in a criminal case, the right to be present, are violated when a judge engages in substantive discussions with one party in the absence of the other.

Here chambers conferences addressing substantive issues were conducted in *ex parte* fashion, outside the presence of both petitioner Johnson and his attorney. The facts of the case were specifically discussed and overheard by then court attorney, Ms. Memblatt who was corroborated in large part, by the prosecutor himself. Significantly, the second trial, over which the same Justice presided, resulted once again in petitioner's conviction. Accordingly, under *Murchison* and *Snyder* petitioner was denied his due process right to a fair tribunal, and his right to be present and/or be represented by counsel, at all stages of the proceedings. The writ should issue.

# POINT IV

## DENIAL OF HABEAS CORPUS RELIEF WOULD RESULT IN A FUNDAMENTAL MISCARRIAGE OF JUSTICE

The "fundamental miscarriage of justice" exception is based upon the principle that "habeas corpus is, at its core, an equitable remedy." *Schlup v. Delo*, 513 U.S. 298, 319 (1995). The Supreme Court has consistently recognized that "'[i]n appropriate cases,' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield' to the imperative of correcting a fundamentally unjust incarceration.'" *Id*. at 320-21 (quoting *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

The facts of this case cry out for application of the "fundamental miscarriage of justice" exception.

Tyrone Johnson was convicted on the basis of purported out-of-court declarations untested by cross examination and testimony by a cooperating witness, Henry Hanley. Hanley gave multiple, inconsistent accounts of the incident that were refuted by third party witnesses and he received substantial benefits for providing evidence against Tyrone Johnson. Sharmaine Ramdass testified that Hanley was not upstairs when Vann was shot. (T. 1172) Shanise Knight testified that she actually woke Hanley with

a stomp on the floor, and summoned Hanley to come upstairs. (T. 1170-1171). Knight further testified that someone other than petitioner Johnson shot Vann. Prosecution witness Deval Rhodes, an off-duty police officer who worked as security in Vann's club, testified that he knew Tyrone Johnson and that he and Vann had a good rapport (T. 530, 539). Indeed, petitioner was present when, a week before Vann's murder, someone entered the club and point a gun at Vann. Petitioner remained in the club and spoke to Vann after that incident (T. 543-546).

No other evidence tied petitioner Johnson to the scene of Vann's homicide and he made no incriminating statements. Should this Court determine that any of the constitutional violations outlined above are procedurally barred, this Court should reach them because a failure to do so would result in a fundamental miscarriage of justice.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, this Court should issue an order granting a writ of error *habeas corpus* ordering petitioner Johnson's immediate release from custody or, alternatively, a new trial.

Dated: New York, New York
      August 13, 2012               Respectfully submitted,

                                     /s/ *Robert J. Boyle*
                                     ROBERT J. BOYLE
                                     351 Broadway
                                     3rd floor
                                     New York, N.Y. 10013
                                     (212) 431-0229
                                     Attorney for Petitioner